Defiance Lumber Company v. Commissioner.
Defiance Lumber Co. v. Commissioner
Docket No. 34067.
United States Tax Court
1953 Tax Ct. Memo LEXIS 180; 12 T.C.M. (CCH) 808; T.C.M. (RIA) 53246; July 8, 1953
*180 Held: That the petitioner did not accumulate its earnings or profits beyond the reasonable needs of its business and accordingly is not subject to the surtax imposed by Sec. 102, Internal Revenue Code. L. R. Bonneville, Esq., 816 Washington Bldg., Tacoma, Wash., Frank C. Neal, Esq., Owen P. Hughes, Esq., and George J. Busch, C.P.A., for the petitioner. John O. Durkan, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income tax and section 102 surtax totaling $272,691.83 for 1947 and $72,449.25 for 1948. Issues bearing on the income tax deficiencies have been settled and can be reflected in a Rule 50 computation. The only question for decision is whether the earnings or profits of the petitioner were *181 permitted to accumulate in the taxable years beyond the reasonable needs of the business so that as a result the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders by permitting accumulation instead of dividing or distributing its earnings or profits. Findings of Fact The stipulated facts are so found and the stipulation included herein by reference. The petitioner, referred to hereafter as Definance, is a corporation organized under the laws of the State of Washington. Its tax returns for the years 1947 and 1948 were filed with the collector of internal revenue for the district of Washington. The petitioner was organized in 1906 by L. L. Doud (father of the present stockholders) and several of his business associates, with a capital stock of $75,000, all common stock of $100 par value. This stock was increased from time to time until 1920, at which time there was $275,000 common stock outstanding, all owned by L. L. Doud, W. H. Doud (a brother of L. L. Doud and an uncle of Lee L. Doud and Donald H. Doud) and Mina McNeeley. In May 1920 the capital stock was increased to $400,000, of which $275,000 was common and $125,000 *182 was preferred, and the preferred stock was taken and owned by the W. H. Doud and Mina McNeeley interests. The preferred stock had no voting rights so long as dividends were paid, but did have voting rights if dividends were not paid. L. L. Doud, Sr. died in 1934 and upon his death all of the common stock was owned by Lee L. Doud, Donald H. Doud and three daughters of said L. L. Doud, Sr., (Neva Martin, Gladys D. Martin and Lola D. Little). There were outstanding at that time 1030 shares of preferred stock. At the death of L. L. Doud, Sr. the common stock outstanding had been reduced from time to time until there were outstanding and in the hands of the children of L. L. Doud, Sr. 739.8934 shares of common stock of the par value of $100, and there were outstanding in the hands of outsiders, or other persons and parties other than the Doud Family, 1030 shares of preferred stock of the par value of $100. After the death of L. L. Doud, Sr. the operation and management of the company was at all times in the hands of his sons, Lee L. Doud and Donald H. Doud or Lee L. Doud alone, and none of the daughters were employed or engaged actively in the operation of the company. One daughter, *183 Lola D. Little, died in the year 1942 and her stock was later acquired by Lee L. Doud and Donald H. Doud. At the date the dissolution proceedings in 1949 were begun, the ownership of the petitioner was as follows: Lee L. Doud
1617 shares
Donald H. Doud
464 shares
Neva S. Martin
337 shares
Gladys D. Martin
332 shares or a total of 2750 shares of the par value of $100 each, and the common stock was owned in the same proportion by the same stockholders during the taxable years 1947 and 1948. The outstanding preferred stock was reduced to $51,500 in 1941 and increased to $62,500 in 1943, and remained the same until 1947 when the balance of the preferred stock was retired. During almost all the time from the date of the death of L. L. Doud, Sr. until the dissolution of Definance, the board of directors of Defiance consisted of Lee L. Doud, Donald H. Doud and Frank C. Neal. Neal was a lawyer with wide experience in the lumber industry. He was the active president of Buffelen Lumber & Manufacturing Company (hereafter called Buffelen) from 1928 to 1948. Buffelen operated a large door, plywood and lumber mill in Tacoma, Washington. Defiance owned and operated a *184 sawmill located on Puget Sound in Tacoma, Washington. It was actively engaged in the buying of logs and manufacturing the same into lumber and other timber products. It also owned some timber lands of its own. The sawmill had a capacity of approximately 250,000 board feet per day on a single eight-hour shift and used approximately four to five million feet of logs per month. It contracted its logging to gyppo loggers in the 1940's. The following table shows the profits, losses, income taxes accrued and dividends paid by Definance: Federal Income
Dividends Paid
Profits
Losses
Taxes Accrued
Common
Preferred
1917
$ 45,130.40
$ 4,896.06
$ 8,107.32
1918
25,986.35
21,803.18
32,402.28
1919
5,129.21
318.10
32,369.28
1920
158,075.08
51,208.85
$ 11,733.78
1921
$ 3,898.28
7,629.96
1922
42,102.04
5,976.71
7,462.71
1923
216,110.99
27,749.92
7,419.96
1924
14,304.83
2,328.66
7,376.87
1925
34,491.35
7,233.32
1926
5,407.39
7,209.96
1927
6,697.80
16,500.00
7,209.96
1928
11,892.77
1,361.15
47,500.00
7,209.96
1929
59,788.40
6,792.55
16,500.00
7,209.96
1930
103,283.19
15,000.00
7,209.96
1931
74,557.53
29,000.00
7,209.96
1932
102,562.81
7,209.95
1933
18,621.92
2,742.40
1934
$ 20,675.19
$ 920.12
1935
$ 30,529.49
1936
48,662.10
6,011.97
1937
73,484.51
10,009.79
$ 40,694.16
$ 36,379.49
1938
48,105.30
5,407.50
1939
49,083.24
9,689.45
5,407.50
1940
24,959.49
12,817.89
5,407.50
1941
307,835.46
183,472.59
42,000.00
5,407.50
1942
379,795.21
312,138.97
16,500.00
3,605.04
1943
157,858.18
121,991.33
19,250.00
3,832.11
1944
100,106.84
64,272.22
19,250.00
5,468.75
1945
27,581.73
8,344.37
19,250.00
4,375.00
1946
429,718.60
166,786.26
38,500.00
4,375.00
1947
1,255,916.89
471,233.14
55,000.00
4,375.00
1948
414,788.80
162,275.57
41,250.00
1949
25,874.06
6,181.71
$3,918,889.68
$404,125.75
$1,661,322.96
$489,073.04
$183,366.70
*185 The following is a list of the high and low totals of notes payable to banks: Notes Payable
Year
High
Low
1940
$151,875.00
$ 65,375.00
1941
143,000.00
25,000.00
1942
25,000.00
None
1943
160,000.00
80,000.00
1944
250,000.00
125,000.00
1945
250,000.00
50,000.00
1946
175,000.00
None
1947
None
None
1948
200,000.00
None
1949
25,000.00
None
The following is a table showing the net worth of Definance: 1940
$ 276,047.56
1941
351,571.64
1942
417,229.31
1943
458,704.53
1944
471,501.75
1945
458,250.30
1946
676,234.38
1947
1,353,635.14
1948
1,569,648.37
The average cost of logs to Defiance ranged from $9.95 per thousand in 1932 to $46.12 in 1948 and the average sales price of its finished products during the same period was from $9.57 to $72.91. Before 1940 there were many independent loggers operating in the Puget Sound area and Defiance had little difficulty in filling its need for logs by purchase. After 1940 the open log market began to dry up and Defiance had to acquire timber land of its own and produce some of its own logs. During the years 1943 to 1948, inclusive, Defiance purchased logs and *186 logged from its own lands the following: Year
Purchased
Logged
Total
Feet
1943
45,282,928
1,442,920
46,725,848
1944
43,792,872
8,789,540
52,582,412
1945
29,989,650
4,616,560
34,606,210
1946
30,965,887
9,729,820
40,695,707
1947
29,135,707
11,039,640
40,175,347
1948
25,439,893
8,847,081
34,286,974
During the late war and early post war years, Defiance and owners of similar mills customarily started at the opening of spring logging to acquire not only current log needs but a supply to carry them over the winter months and down to the opening of the next spring's logging. It was desirable to have on hand, as of December 31, enough logs for a three months' operation. For December 31 of each year the following table represents the log inventory of Defiance: Average
Year
Feet
Amount
Per M Feet
1944
7,551,595
$224,874.00
$29.78
1945
10,394,880
250,110.00
24.06
1946
4,443,593
117,550.00
26.45
1947
4,003,142
148,950.00
37.20
1948
6,771,294
303,195.00
44.78 The estimated amount of timber owned by Defiance or under contract at the end of 1946 was 29,500,000 feet, the estimated amount of *187 timber owned or under contract at the end of 1947 was 41,000,000 feet, and the estimated amount of timber owned or under contract at the end of 1948 was 56,000,000 feet. A full three months' supply of logs for Defiance represented an inventory value on December 31, 1947, and December 31, 1948, of about $500,000. In 1942 Defiance entered into operations with Buffelen whereby a major portion of their logging and timber operations and the purchase of timber and logs were pooled, partly through Defiance Buffelen, Inc., a corporation organized by Defiance and Buffelen. The stock of Defiance Buffelen, Inc. was owned equally by Defiance and Buffelen. This joining of interests provided increased cash for bidding for timber and made it possible to bid on larger tracts. Representatives of Defiance and Buffelen attended most of the public sales of timber during the years in question and made every effort possible to obtain timber within their means. In 1947 Defiance acquired an estimated 2,390,000 feet of timber alone and jointly with Buffelen, 23,571,410 feet. In 1948 the estimated timber acquired alone was 24,800,000 feet and 9,859,800 feet jointly. During the 1940's competition from increasing *188 numbers of plywood and pulp manufacturers in western Washington made it even more difficult for Defiance to obtain adequate supplies of logs for its business. The prospect and difficulty of acquiring enough logs or closing down was considered by the directors of Defiance at a meeting in December of 1946 and again in November of 1947. At the 1946 meeting the making of commitments for timber purchase of not to exceed $500,000 was authorized and at the 1947 meeting where deals involving the expenditure of $400,000 were discussed, officials were authorized to invest whatever sums were necessary in their judgment to improve the timber supply. In 1947 Defiance increased its open line of bank credit to $500,000. There was an unprecedented demand for logs and timber after the end of World War II. This demand continued through 1947 and early 1948 when it slacked off. It picked up again during the Korean conflict. The officers of Defiance were hopeful that they could obtain an adequate supply of logs and timber for their business all through the years 1947 and 1948. Defiance had advances to contract loggers (gyppos) outstanding at various times during 1947 and 1948 ranging from approximately *189 $77,000 to $181,000. The Defiance mill was kept in a good state of repair during the taxable years. A comparative balance sheet of Defiance follows: As of
December 31,
August 31,
December 31,
1947
1948
1948
ASSETS
Current Assets
Cash on Hand and in Banks
$ 522,186.23
$ 28,833.34
$ 25,711.86
Accounts Receivable
377,312.18
432,845.06
188,411.49
Sub-Total
$ 899,498.41
$ 461,678.40
$ 214,123.35
Inventories
Logs
148,950.00
306,494.20
303,195.00
Lumber
42,745.00
137,280.00
274,152.70
Lath and Wood
1,810.00
3,395.00
2,625.00
Sub-Total
$ 193,505.00
$ 447,169.20
$ 579,972.70
Investments
Stocks
2,250.00
140,000.00
140,000.00
Bonds
409,000.00
409,000.00
177,000.00
Cash Surrender Value - Life Ins. Policy
20,650.00
21,600.00
21,600.00
Notes Receivable
Doud Lbr. Co.
285,000.00
225,000.00
Buffelen, Inc.
39,750.00
80,575.00
80,575.00
Sub-Total
$ 471,650.00
$ 936,175.00
$ 644,175.00
Fixed Assets
Mill Site
71,906.81
71,906.81
71,906.81
Plant and Equipment, Depreciated
27,646.24
9,329.74
13,954.65
Timber
250,085.67
301,319.20
285,812.15
Timber Lands
22,186.53
22,696.53
22,696.53
Logging Equipment
17,147.14
2,250.00
Sub-Total
$ 388,972.39
$ 407,502.28
$ 394,370.14
Deferred Assets
Unexpired Insurance Premiums
$ 13,213.94
$ 9,184.16
$ 7,855.70
Prepaid Interest
Sub-Total
$ 13,213.94
$ 9,184.16
$ 7,855.70
Grand Total
$1,966,839.74
$2,261,709.04
$1,840,496.89
LIABILITIES
Current Liabilities
Accounts Payable
118,714.72
50,493.25
71,282.88
Wages Payable
13,111.17
22,989.08
6,836.17
Notes Payable
200,000.00
25,000.00
Accrued Taxes - Real Estate
10,145.57
6,203.90
10,203.90
Sub-Total
$ 141,971.46
$ 279,686.23
$ 113,322.95
Reserves
Federal Income Taxes
471,233.14
364,994.57
157,525.57
Capital
Capital Stock Outstanding -
Common
275,000.00
275,000.00
275,000.00
Preferred
Sub-Total
$ 275,000.00
$ 275,000.00
$ 275,000.00
Surplus
1,078,635.14
1,342,028.24
1,294,648.37
Grand Total
$1,966,839.74
$2,261,709.04
$1,840,496.89
*190 Ratios of current assets to current liabilities as computed by the respondent are as follows: 1946 - 4.6 to 1, 1947 - 7.6 to 1, 1948 - 7 to 1 Net income after taxes was $262,932.34 in 1946; $784,683.75 in 1947; and $252,513.23 in 1948. The percentage of dividends to net income for the same years was 16.3, 7.5, and 16.3, respectively. In its earlier years Defiance had operated a retail branch, later abandoned. The retail lumber business is related to lumber manufacturing and many lumber manufacturers operate retail divisions. In 1946 Lee L. and Donald H. Doud acquired a half interest in a new retail company formed in San Jose, California. This company became a good customer of Defiance. By March 30, 1948, it owed Defiance $282,132 on open account. On March 9, 1948, Defiance purchased the other half stock interest for $136,500. On March 17, 1948, Defiance advanced $300,000 to the new company and took a note therefor. The open account was paid off with the proceeds of this note and thereafter all purchases from Defiance were made in regular course. The note bore four per cent interest. One of the reasons for the acquisition of the stock in this retail company and the $300,000 *191 advance was to protect the account receivable and retain the retail outlet. The average monthly sales prices of Defiance's products from January 1, 1948, to the end of March 1949, were as follows: (Per thousand feet, B.M.) Jan., 1948
$74.64
Feb.
80.28
Mar.
69.31
Apr.
68.83
May
84.79
June
78.34
July
75.55
Aug.
70.76
Sept., 1948
$73.61
Oct.
67.92
Nov.
73.63
Dec.
66.70
Jan., 1949
70.13
Feb.
61.90
Mar.
52.10
In the spring of 1949 (March or April) the directors of Defiance determined that the best interests of the corporation and its stockholders required that Defiance be dissolved. Proceedings to that end were begun on April 15, 1949, and at the time of the hearing of this case were still in progress. If Defiance had distributed its earnings in 1947 and 1948 its stockholders would have been subjected to a substantial surtax liability. Defiance did not permit its earnings and profits for 1947 and 1948 to accumulate beyond the reasonable needs of the business. Defiance was not availed of during 1947 and 1948 for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting its earnings and *192 profits to accumulate instead of being divided or distributed. Opinion The only question before us is one of fact and is disposed of by our ultimate findings. The petitioner's primary contention, and indeed its only one, is that its cash, surplus and liquid assets were needed at all times during 1947 and 1948 for the reasonable needs of the business and, accordingly, that it did not accumulate its earnings for the purpose proscribed by section 102. It points to the necessity for using increased cash for purchasing larger inventories of logs and additional timber, for financing gyppo loggers, and for acquiring a retail outlet. It also stresses the hazardous nature of its business and a possible move of its operations to Oregon or California. We are not impressed with the latter points. After all, Defiance had survived whatever business hazards there were for a good many years and we cannot conclude on the record that a move to Oregon or California was ever such a reasonable certainty as to require the accumulation of earnings. On the other hand, we think that the petitioner has properly placed reliance on the other points specified and has carried its burden of proof. The facts *193 have been rather fully set out in our findings and we will not enter upon a detailed discussion of them. In brief, the main trend of the respondent's argument is that the petitioner intended ever since the early forties to dissolve and discontinue its business by 1948 or 1949 and that therefore it could have had no legitimate business use for the earnings or profits accumulated in those years. Further, the respondent contends that the investment in the retail outlet in San Jose was not made for the purpose of the petitioner's business but simply to set Lee Doud, Jr. up in the retail lumber business. The evidence to substantiate these arguments is inconsiderable and we think it is far outweighed by evidence to the contrary. We have remarked in recent cases that the determination of the reasonable needs of a business for capital is, in the first instance, a task for the officers and directors of the corporation. Crawford County Printing & Publishing Co., 17 T.C. 1404; Gazette Telegraph Co., 19 T.C. 692. Nevertheless, the ultimate determination of reasonable needs is "typically a judicial question" and our function in this respect is not performed by doing *194 no more than accepting the decision of the petitioner's officers. Trico Products Corporation, 46 B.T.A. 346, affd. (C.A. 2) 137 F. 2d 424, certiorari denied 320 U.S. 799. Accordingly, we have carefully considered the whole record and weighed all the evidence before reaching our ultimate findings. 1947 was by far the best year earningswise in the long history of the petitioner. Under some circumstances this could well have justified and required the distribution of a much more substantial portion of its earnings than were actually distributed in order to escape the effect of section 102. We do not think such circumstances exist here. As we see the record, the prices of logs and timber were high during this period. The open log market was drying up. If the petitioner wanted to continue in business it was faced with the pressure of mounting competition for both logs and timber. It seems to us this situation justified a conservative dividend policy and the retention in the business of increased liquid assets. The fact that the petitioner was not actually able to secure greatly enlarged supplies of logs and timber by accumulating its earnings does *195 not, in the circumstances, convince us that the petitioner had some other purpose in mind for so doing. Its main interest was to stay in business, and despite the respondent's argument to the contrary, we do not believe the petitioner had the intention all along to dissolve in the taxable years and quit. That decision was made in 1949 after an alarming decline in the petitioner's business. In our opinion the evidence demonstrates an earnest effort by the officers of Defiance during the taxable years to locate and acquire logs and timber necessary to continue in business and the accumulation of earnings for that purpose during those years was the result of the reasonable exercise of business judgment. We also think that investing in the retail outlet at San Jose and the advance of funds to the retail concern for the purpose of liquidating the open account which it had with Defiance were reasonably related to the petitioner's business. We are unwilling to find that this investment and the advance of funds were made simply for the purpose of providing Lee Doud, Jr. with a business and as an outlet for funds unneeded in the petitioner's own business. We conclude that the petitioner *196 did not accumulate earnings or profits beyond the reasonable needs of its business and reverse the respondent's determination. Decision will be entered under Rule 50.