DAWSON-SPATZ PACKING COMPANY (FORMERLY DAWSON PACKING COMPANY), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63803, 69583. Filed June 16, 1960.

*Clarence E. Schindler, Esq.,* and *J. Bernard Brown, Esq.,* for the petitioner.

*Arthur Clark, Jr., Esq.,* for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in the income tax of the petitioner as follows:

| Year | Deficiency |
|------|-----------|
| 1952 | [1] $2,860.77 |
| 1953 | 8,501.33 |
| 1954 | 4,668.81 |
| 1955 | 4,436.82 |

[1] Some excess profits tax is included in this figure.

The sole issue is whether the cost of certain leasehold improvements made by petitioner should be amortized over the remaining term of the lease or over the useful lives of the improvements; and, if the latter, to determine the remaining useful life of each of said improvements.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Petitioner is a corporation organized on October 3, 1945, under the laws of Kentucky to engage in the business of buying, slaughtering, processing, packing, storing, and selling meat and meat products. Petitioner was originally organized under the name of Dawson Packing Company, which name was changed to Dawson-Spatz Packing Company by amendment to the articles of incorporation on October 17, 1955. Petitioner's principal place of business is located at 1227 (rear) Lexington Road, Louisville, Kentucky.

For the taxable years 1952 to 1955, inclusive, petitioner employed an accrual method of accounting and filed requisite tax returns, on a

calendar year basis, with the district director of internal revenue for the district of Kentucky.

On October 5, 1945, petitioner entered into a lease agreement, hereinafter referred to as the lease agreement, with the owners of the real estate located at 1227 (rear) Lexington Road, hereinafter referred to as the Lexington Road property.

The lease agreement provided, *inter alia*, for a term of 1 year from October 15, 1945, to October 15, 1946; that the leased premises were to be used by petitioner only for the purpose of conducting a slaughter and packing business; that petitioner accepted the premises and equipment leased to it in their present state of repair; and that petitioner was to comply with the city laws and ordinances in regard to nuisances. The lease further provided as follows:

As one of the further considerations of the within Lease and Agreement the Lessors do hereby grant to the Lessee an option to renew the within Lease from year to year for an additional period of time not to exceed nine (9) years after the termination of the within Lease. In the event that in any of said years should Lessee desire to renew the within Lease, Lessee shall notify Lessors of his desire to exercise such option during the eleventh month of the year preceding the year for which such option is exercised. Time is to be considered of the essence. In the event that Lessee shall exercise his option to renew the within Lease Lessee agrees and promises to pay to the Lessors in advance the full amount of the annual rental in the amount of Eighteen Hundred ($1,800.00) Dollars per annum.

As a further consideration for the within Lease and Agreement Lessors grant unto the Lessee an option to purchase the premises herein leased at any time during the term of this Lease or any extension thereof for and in consideration of the payment by the Lessee to the Lessors of the sum of Fifteen Thousand ($15,000.00) Dollars in cash. Said payment to be made on delivery of Deed.

Simultaneously with the execution of the lease agreement, petitioner entered into a supplemental agreement (hereinafter referred to as such) with the lessors. The supplemental agreement provided that the rental provisions and the option privileges described in the lease agreement were to also apply to a lot located at the rear of the Lexington Road property.

The Lexington Road property had been used for the operation of a slaughterhouse and related business activities for approximately 100 years prior to the negotiation of the lease and supplemental agreement, and it was one of the few locations in and around Louisville where a slaughterhouse could be operated.

The written renewal agreement dated October 5, 1950, and extending the lease and supplemental agreement up to and including October 15, 1951, also modified them to include the rental and option to purchase a lot described therein and set the total option price of the property covered by all of the above-mentioned agreements at $15,400.

At the time petitioner entered into the lease and supplemental agreement, the Lexington Road property was in very poor condition. Petitioner wanted to commence operation with as little capital as possible, and it made no material improvements in 1945, except for installing a secondhand upright boiler. Later, petitioner was compelled to make certain improvements.

Pursuant to the insistence of the Louisville and Jefferson County Health Department, petitioner constructed a cooler building, which was completed in 1948 at a cost of $32,044.20. This cooler was approximately 26 feet by 60 feet, and 20 feet high. It had a concrete foundation, 8-inch concrete block walls, cork insulation, electric wiring, plumbing, and a roof constructed of steel beams spaced 12 or 14 feet apart, wood roof rafters, wood sheathing, and also what is referred to as an inexpensive, 10-year, built-up roof. Inside the cooler, structural steel members were put across the ceiling to carry slaughtered cattle to various locations. The cooler was equipped with a refrigerating device and it had two loading docks.

On December 27, 1950, petitioner had surveyed the Lexington Road property and contiguous tract, and obtained exact legal descriptions.

In 1952, petitioner installed a knocking pen, hog-scalding tank, and dehairing machine on the Lexington Road property at an aggregate cost of $1,030.59. This installation was necessary because the old pen and tank, which were located on the Lexington Road property at the time petitioner leased the premises, had become worn out and obsolete. The knocking pen was constructed of wood and the scalding tank was made out of steel. Lime water is used in scalding hogs, and it takes between 3 to 5 years for the lime to eat through the steel.

In 1952, petitioner started construction of a "new building" (hereinafter referred to as such) on the Lexington Road property. The new building was actually the repaired second floor of a preexisting structure that had been shored up, and a first floor built beneath it. In addition, an old stable or garage was torn down and new office space was created. The new building was constructed of concrete block, steel sash, cement floor, and wood roof, with a 10-year, built-up roof thereon over the section of the first floor that extended beyond the second floor. It was completed in 1953 at a cost of $21,578.44, and contained a new boiler, shower rooms, washrooms, and office space.

Petitioner had to install the new boiler because its insurance company refused to continue coverage on the old one. The shower rooms and washrooms were constructed at the request or demand of the aforementioned health department.

Petitioner reported net sales and net income in its income tax returns for the years 1946 to 1955, inclusive, in the following amounts:

| Year | Net sales | Taxable net income | Year | Net sales | Taxable net income |
|---|---|---|---|---|---|
| 1946 | $1,094,534.32 | $30,293.70 | 1951 | $1,990,258.22 | [1] $15,971.31 |
| 1947 | 1,297,915.07 | 15,269.82 | 1952 | 1,975,762.61 | [1] 53,892.04 |
| 1948 | 1,603,140.68 | 18,801.47 | 1953 | 1,938,328.59 | 58,249.59 |
| 1949 | 1,644,756.75 | 23,434.00 | 1954 | 1,881,914.05 | 46,015.57 |
| 1950 | 1,781,526.11 | 30,074.54 | 1955 | 1,822,089.48 | 35,644.18 |

[1] Inclusive of adjustments determined in an audit by the Internal Revenue Service dated February 26, 1954.

On September 30, 1955, petitioner notified the lessors in writing that it was exercising the option to purchase. On October 31, 1955, the lessors conveyed the Lexington Road property to the petitioner by deed of general warranty, and within about 1 year thereafter petitioner had expended an additional $150,000 to $160,000 improving the property.

Respondent examined petitioner's income tax returns for the years 1950 to 1952, inclusive. He allowed petitioner's amortization of the cost of the cooler over the remaining term of the lease agreement as extended. In addition, respondent determined that the cost of the scalding tank and knocking pen constructed in 1952 was to be capitalized and amortized on the same basis, and not treated as an expense of 1952.

On its 1953, 1954, and 1955 income tax returns, petitioner claimed deductions for amortization of the cooler, the scalding tank and knocking pen, and the new building also on the basis of dividing the unrecovered cost by the remaining maximum extended term of the lease agreement. Based on respondent's examination of these returns and his reexamination of petitioner's return for 1952, respondent determined that the unamortized cost of the cooler as of December 31, 1951, should be depreciated over its remaining useful life, which was determined to be 16 years. Respondent also determined that the cost of the scalding tank and knocking pen and of the new building should be depreciated over the respective useful lives of these assets, and that their useful lives were 10 and 30 years, respectively.

By January 1, 1953, but not before that time, petitioner intended to exercise its option to purchase the Lexington Road property.

As of January 1, 1953, the useful life of the cooler was 15 years and the useful life of the scalding tank and knocking pen was 3 years. The new building and new boiler completed and installed in 1953 had a useful life of 20 years.

## OPINION.

Petitioner contends that the cost of the leasehold improvements made to the Lexington Road property should be amortized over the remaining period of the lease, as extended to the maximum by its renewal provisions, and not over the respective useful lives of said improvements. In support of this contention, petitioner cites the case of *Fort Wharf Ice Co.*, 23 T.C. 202, 207 (1954), and quotes the following passage from that case on brief:

Ordinarily a taxpayer who makes improvements of a capital nature on property that is used in his trade or business is allowed a deduction for depreciation based on the useful life of the improvements. As an exception to this rule, if a taxpayer makes improvements on property of a capital nature in a situation where he will lose the ownership or control of that property before the usefulness of the assets is exhausted, he will be allowed to amortize the cost of the improvements over the period during which he has the ownership or control of the property. Such a situation arises when a lessee for a term of years makes capital improvements to the leasehold, having a longer economic life than the term of the lease, which will pass to the lessor at the end of the lease period. * * * This exception to the general rule is justified because otherwise the taxpayer would either be unable to recover his basis or would be forced to take disproportionate loss at the time when he loses the improvements.

However, in the *Fort Wharf Ice Co.* case we then stated that a "lessee is not always entitled to amortize the cost of such capital improvements," and in the case of *Leonard Refineries, Inc.*, 11 T.C. 1000, 1010 (1948), we said that—

where it is apparently certain that the option to purchase leased land will be exercised, depreciation rates for assets located on such land should be based on their estimated physical lives. As was said in *Rankin v. Commissioner*, 60 Fed. (2d) 76, it is only necessary that it appear the lessee's use or occupancy will exceed the life of the improvement. If that requirement is met, then the depreciation should be spread over the full life of the asset.

In support of petitioner's contention is the self-serving testimony of one of petitioner's officer-stockholders. He testified that petitioner did not intend to exercise its option to purchase the Lexington Road property until early October of 1955 because it knew that to keep the slaughterhouse in operation it would have to spend about $150,000 to $160,000 on additional improvements. However, in view of the permanent capital improvements petitioner had constructed, or was committed to construct, by early in 1953, petitioner's successful operations prior to that time, and other uncontroverted facts set forth below, this testimony alone is insufficient to overcome petitioner's burden of proof.

While petitioner could purchase the Lexington Road property and the additional lots for $15,400, it had, by early in 1953, started construction on the new building, knowing that the useful life of this

capital improvement would extend far beyond the termination date of the lease agreement. Part of the new building consisted of office space, construction of which was purely voluntary on the part of petitioner. In addition, the Lexington Road property was one of the few locations in and around Louisville where a slaughterhouse could be operated.

Thus, considering the circumstance at the start of 1953, it appears that petitioner would certainly exercise its option to purchase, and we have found that, by that time, petitioner did in fact intend to purchase said property.

We view the constructions of 1948 and 1952 differently. The 1952 construction cost only $1,030.59 and was admittedly short-lived. The 1948 construction was early in the lease term, and all of it was required if petitioner was to stay in business at this location.

We must now determine the useful lives of the improvements in question. Respondent has conceded that the life expectancy of the scalding tank and knocking pen installed by petitioner in 1952 was 4 years. We have found its remaining useful life at January 1, 1953, as 3 years.

Since petitioner and respondent have treated the cooler as one unit, we must consider it as such in determining its useful life. Petitioner's sole expert witness testified only that the cooler had a useful life of 15 years as of the date of its completion in 1948. Furthermore, his estimate of the useful life of the cooler seems to be limited or based upon the useful life of one part of the cooler, i.e., its wooden, 10-year, built-up roof. Said expert also testified that the useful life of the wooden, 10-year, built-up roof could be extended by proper maintenance and repair, and that the concrete elements of the cooler would have a useful life in excess of 15 years. Thus, we cannot find that petitioner has overcome the prima facie correctness of respondent's determination that the cooler had a useful life of 16 years as of January 1, 1952, and we have found its useful life at 15 years on January 1, 1953.

We have determined the useful lives of the new building and the new boiler as one unit. The aforementioned witness testified that in his opinion the useful life of the new building, except for the boiler, was 15 years. He testified that the life of the new boiler was less than that, but his testimony in this regard was very weak. It seems that his estimate as to the building is largely based upon the useful life of one element, i.e., its wooden, 10-year, built-up roof.

Considering all the record evidence, including the intended function of said improvement, we have found that the new building and boiler had a useful life of 20 years.

*Decisions will be entered under Rule 50.*