DIELECTRIC MATERIALS COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2158–70. Filed February 8, 1972.

*William M. Ward,* for the petitioner.

*Bert L. Kahn* and *William L. Ringuette,* for the respondent.

TANNENWALD, *Judge:* Respondent asserted a deficiency of $32,442.51 in petitioner's income tax for 1966. Petitioner has conceded the correctness of one of respondent's adjustments, leaving the following issues for decision:

(1) Whether compensation paid by petitioner to its president and principal shareholder was reasonable in amount so as to be deductible under section 162(a)(1) [1];

(2) Whether the useful life of petitioner's factory building is 45 years, as contended by respondent, or 30 years, as contended by petitioner; and

(3) Whether petitioner is subject to the accumulated-earnings tax imposed by section 531.

### GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Dielectric Materials Co. (hereinafter referred to as Dielectric or petitioner) is an Illinois corporation with its principal office located in Chicago, Ill. It filed its U.S. Corporation Income Tax Return for 1966 on an accrual basis with the district director of internal revenue, Chicago, Ill.

Petitioner's principal business involves the manufacturing and marketing of insulated electrical wire and cable and tubular thermoplastic products. At all times since its formation in 1946, Hans D. Isenberg (hereinafter sometimes referred to as Isenberg) has been its principal shareholder.

During 1966, petitioner had 107 employees exclusive of Isenberg and Oscar C. Muenzer. In addition, it employed several manufacturer's

---

[1] All references are to the Internal Revenue Code of 1954, as amended.

representatives to sell its products; they were compensated on a commission basis.

Between December 9, 1954, and December 31, 1966, the outstanding stock of petitioner was held as follows:

| Shareholder | Number of Shares |
|---|---|
| Hans D. Isenberg | 950 |
| Alice A. Isenberg[2] | 50 |

During the entire taxable year 1966, the officers of petitioner were as follows:

| | |
|---|---|
| President-treasurer | Hans D. Isenberg. |
| Vice president-secretary | Alice A. Isenberg. |
| Vice president-assistant secretary | Oscar C. Muenzer. |

The aforementioned officers also constituted the petitioner's board of directors during 1966.

### Issue 1. Unreasonable Compensation Issue

#### FINDINGS OF FACT

To the extent applicable, our findings of fact as to issues 2 and 3 are incorporated herein by this reference.

From its inception and throughout 1966, Isenberg served as chief executive officer and engineer of petitioner.

Isenberg holds degrees from the following institutions:

| Degree | Institution |
|---|---|
| Bachelor of science | University of Zurich. |
| Mechanical engineer | University of Stuttgart. |
| Electrical engineer | University of Stuttgart. |
| Master of science | University of Berlin. |

Isenberg completed all of the requirements for the degree of Ph.D. in physics at the University of Stuttgart except for the oral examination. In addition to the above, he also attended medical school at Northwestern University and the University of Illinois for four semesters. He is a registered professional engineer in the State of Illinois.

As president and chief executive officer of Dielectric, Isenberg performed all of the normal duties generally accompanying that position in almost any small corporation. He formulated the financial and operational policies of petitioner and was active in contacting prospective and current customers. In addition, as Dielectric's engineer, he applied the full range of the knowledge garnered from his educational background, as well as that accumulated from his 28 years of work (by 1966) in the area of petitioner's products. He utilized his

---

[2] Alice A. Isenberg, who died on Jan. 12, 1967, was Isenberg's wife.

skills to enable petitioner to meet technical requirements for cable, wire, or tubular products required by potential and actual customers. Isenberg's efforts in this direction did not always result in orders, but these "specialty items" made up 20 to 25 percent of petitioner's total net sales in 1966. "Specialty items" developed by Isenberg in prior years made up petitioner's "standard line" of products and constituted about 75 to 80 percent of petitioner's total net sales in 1966. Petitioner's ability to manufacture special items was particularly beneficial to petitioner's principal outside sales representative, accounting for 50 percent of his orders for petitioner's products.

Isenberg was also in charge of purchasing the machinery necessary to manufacture petitioner's products. He developed modifications of the machines which increased their productivity and efficiency and produced substantial savings for petitioner. Isenberg obtained several patents as a result of his innovative devices and processes, absorbing all costs of obtaining the patents himself, but permitting petitioner the use of these patents without charge. One of Isenberg's patents was for a special high-voltage cable (called a Diploit Cable) which petitioner manufactured and sold with considerable success. In 1966, sales of this cable made up 20 to 30 percent of petitioner's net sales.

Isenberg also was responsible for keeping abreast of technological advances which might be of use to petitioner or its customers insofar as products manufactured by petitioner were concerned. To this end, he constantly read a variety of trade and technical journals and, from time to time (including 1966), attended conventions of scientists and other technically skilled professionals.

In respect to the technological endeavors heretofore described, Isenberg was the only employee of petitioner capable of discharging these duties. Isenberg's technical skills were well known throughout the trade and substantially and continually enhanced petitioner's reputation. On several occasions, negotiations for the sale of petitioner's business were terminated because of Isenberg's refusal to accept a condition imposed by the purchaser, i.e., that Isenberg continue to run petitioner.

During 1966, Isenberg spent 45 to 50 hours per week at petitioner's plant. He also spent 11 weeks at his summer home in Evergreen, Colo., and another 3 weeks skiing in Colorado and Sun Valley, Idaho. At his homes in Evergreen and Wilmette, Ill., he spent a small part of his time on petitioner's business, including working on new processes, devices, and product designs in the small laboratories he maintains at these residences. Isenberg's wife was seriously ill during 1966.

On March 9, 1953, petitioner's board of directors decided to pay Isenberg, as compensation for services, 5 percent of the net sales of

petitioner in addition to his previously established annual salary of $40,000. Subsequent to the aforesaid meeting and through the end of the year in issue, Isenberg's rate of compensation had not been altered. Isenberg's compensation from 1954 through 1969 was as follows:

| Year | Salary | Commission | Total compensation [3] |
|------|--------|-----------|------------------------|
| 1954 | $40,000 | $20,555 | $60,555 |
| 1955 | 40,000 | 27,640 | 67,640 |
| 1956 | 40,000 | 26,735 | 66,735 |
| 1957 | 40,000 | 29,027 | 69,027 |
| 1958 | 40,000 | 25,386 | 65,386 |
| 1959 | 40,000 | 32,876 | 72,876 |
| 1960 | 40,000 | 33,366 | 73,366 |
| 1961 | 40,000 | 30,808 | 70,808 |
| 1962 | 40,000 | 41,320 | 81,320 |
| 1963 | 40,000 | 43,007 | 83,007 |
| 1964 | 40,000 | 46,979 | 86,979 |
| 1965 | 40,000 | 67,664 | 107,664 |
| 1966 | 40,000 | 102,146 | [4]142,234 |
| 1967 | 40,000 | 76,771 | 116,771 |
| 1968 | 40,000 | 52,089 | 92,089 |
| 1969 | 40,000 | 62,644 | 102,644 |

Oscar C. Muenzer served as petitioner's general manager and was in charge of purchases of raw materials and supplies, receipt and handling of orders, and production and shipping. From 1957 to 1969, he was compensated by petitioner by way of a salary of $24,000 per annum plus a commission ranging from 1.4 to 2.8 percent of net sales.

During the years 1947 through 1961, petitioner paid cash dividends as follows:

| Year | Dividend | Year | Dividend | Year | Dividend |
|------|----------|------|----------|------|----------|
| 1947 | $7,000 | 1952 | $10,000 | 1957 | $10,000 |
| 1948 | 14,000 | 1953 | 10,000 | 1958 | 10,000 |
| 1949 | 7,000 | 1954 | 10,000 | 1959 | 10,000 |
| 1950 | 8,000 | 1955 | 10,000 | 1960 | 10,000 |
| 1951 | 9,000 | 1956 | 10,000 | 1961 | 10,000 |

Since the year 1961 and up to and including the taxable year 1966, petitioner has not paid any dividends.

Respondent determined that Isenberg's compensation in 1966 was excessive in the amount of $51,073.

### ULTIMATE FINDING OF FACT

$110,000 constituted reasonable compensation paid for services rendered by Isenberg to petitioner in 1966.

---

[3] Exclusive of contributions made by petitioner to its pension plan on behalf of Isenberg for the years 1954 through 1963. No contributions were made to the plan for Isenberg subsequent to 1963.

[4] The discrepancy between the total of salary and commission ($142,146) and the total compensation paid to Isenberg ($142,234) is not explained in the record. However, both parties in their briefs agree that Isenberg received $142,234 in 1966 and we proceed on that assumption accordingly.

The question of whether amounts paid to shareholder-employees of a closely held corporation constitute reasonable compensation is one of fact, and the burden of proving the reasonableness thereof is on the taxpayer. *Botany Mills* v. *United States*, 278 U.S. 282 (1929) ; *Anthony Mennuto*, 56 T.C. 910 (1971). Where the employee, to whom the salary was paid, is in control of the corporate employer's affairs, this circumstance calls for close scrutiny. *Nowland* v. *Commissioner*, 244 F. 2d 450, 455 (C.A. 4, 1957) ; *Anthony Mennuto, supra* at 921.

We see no need to analyze in depth the various factors which we have considered in resolving this issue. Unquestionably, Isenberg was a man with formidable engineering skills [5] which, together with his business acumen, were extremely valuable to petitioner. Prospective purchasers considered him the key to petitioner's success and refused to purchase the business without assurance of the continued availability of his services. Although not determinative (see *R. H. Oswald Co.* v. *Commissioner*, 185 F. 2d 6, 9 (C.A. 7, 1950)), the fact that Isenberg's compensation arrangement had been established some 13 years before the taxable year in issue and had remained unchanged throughout the intervening period should not be completely ignored. We do not think that the value of Isenberg's services can be so correlated to that of Muenzer as to limit his percentage compensation to an amount only slightly more than Muenzer received, as respondent would have us do.

On the other hand, it is a fact that petitioner, despite the existence of substantial earnings, did not pay any dividends during the taxable years 1962 through 1966. Moreover, Isenberg spent a substantial period of time away from petitioner's business, during which he performed minimal services. The pattern of Isenberg's percentage compensation indicates that 1966 was an unusual year due principally to petitioner's foresight in stockpiling copper in advance of an anticipated strike and increased prices obtainable as a result of the consequent short supply of that metal. Although also not determinative, fortuitous occurrences not related to the actual services performed by an employee may appropriately be considered in determining the reasonableness of an employee's compensation. *Huckins Tool and Die*,

---

[5] Our findings of fact show that Isenberg had, over the years, obtained several patents which he made available without charge to petitioner. However, no claim is made that any portion of the compensation paid to Isenberg in 1966 represented payment for the use of such patents and, in any event, the record herein is insufficient to permit a finding of the value of such use. Nevertheless, Isenberg's inventive genius is an element to be considered in determining the value of his services to petitioner in 1966.

*Inc.* v. *Commissioner*, 289 F. 2d 549, 552 (C.A. 7, 1961); *Burford-Toothaker Tractor Co.* v. *Commissioner*, 192 F. 2d 633, 635 (C.A. 5, 1951); *Wood Roadmixer Co.*, 8 T.C. 247, 255 (1947). Moreover, the record herein fails to demonstrate the correlation between Isenberg's efforts and petitioner's sales in 1966, other than a vague, general inference that, as petitioner's chief executive officer, he may have been involved in the management decisions which contributed, in some degree, to the advantageous market position which petitioner had in that year. Finally, it is clear to us that, for a variety of reasons, including his wife's illness, the quantity and quality of Isenberg's efforts in 1966 were, to say the least, not significantly higher than in previous years.

The long and the short of the situation is that we agree with neither petitioner nor respondent. On the basis of entire record herein and our evaluation of the testimony, we hold that, of the $142,234 paid to Isenberg by petitioner in 1966, $110,000 constituted reasonable compensation for services rendered.

### *Issue 2. Depreciation of Factory Building*

#### FINDINGS OF FACT

To the extent applicable, our findings of fact as to issues 1 and 3 are incorporated herein by reference.

Petitioner's factory building was constructed and acquired during the years 1960 and 1961 and consists of a two-story brick factory and office building. Shortly after the building was completed, the concrete floor began to crack and tilt in a number of places. Petitioner depreciated the cost of this building over a 30-year period, using the straight-line method of depreciation.[6] Respondent determined that the useful life of this building was 45 years and adjusted petitioner's depreciation deduction accordingly.

#### OPINION

This issue is also one of fact and the burden of proof is upon petitioner to justify a 30-year useful life. *M. Pauline Casey*, 38 T.C. 357, 381 (1962). It bases its claim on the cracked condition of the floor but, except for the existence of the cracks themselves, no evidence has been introduced demonstrating how the useful life of the building itself has been affected by this event. On the basis of this meager rec-

---

[6] The parties are in agreement as to the acquisition date, the unadjusted cost basis, and the amount of depreciation taken in prior years.

ord, we hold that petitioner has failed to carry its burden. Cf. *Louis Lesser*, 42 T.C. 688, 706 (1964), affd. 352 F. 2d 789 (C.A. 9, 1965) ; *Dawson-Spatz Packing Co.*, 34 T.C. 507, 512 (1960), affd. 289 F. 2d 934 (C.A. 6, 1961).[7]

## Issue 3. Accumulated-Earnings Tax

### FINDINGS OF FACT

To the extent applicable, our findings of fact as to issues 1 and 2 are incorporated herein by this reference.

During 1966, a strike in the copper mines of Africa caused a shortage of copper in this country. Contracts with the workers in domestic copper mines were due to expire on July 1, 1967, and, even though negotiations did not begin until May 15, 1967, a strike was anticipated as early as 1965. In fact, domestic copper mines were struck from July 15, 1967, to March 16, 1968. There was a spurt in the national economy in 1966 and during a part of 1967. Due to this factor and the increasing shortages of copper related to the strike, the prices of raw materials and petitioner's products increased.

Due to the impending strike and the increased orders from customers who were enlarging their own inventories in anticipation of the strike, Dielectric had an exceptionally profitable year in 1966. In large part, this was due to petitioner's foresight in increasing its inventory of raw copper during 1965 and 1966. As a result of acute shortages of copper by reason of the continuation of the strike throughout the major part of 1967 and into 1968 and a drop in the level of national economic activity during 1967, petitioner's yearend inventory was depleted from its 1965 high and its 1967 purchases of raw materials and sales dropped off substantially.

Petitioner's sales and purchases of raw materials (of which copper constituted two-thirds in value) during the years indicated were as follows:

| Year | Purchases of raw materials | Net sales |
|------|---------------------------|-----------|
| 1965 | $817, 767 | $1, 436, 913 |
| 1966 | 853, 396 | 2, 006, 440 |
| 1967 | 746, 077 | 1, 422, 557 |
| 1968 | 488, 162 | 1, 030, 445 |

Shortly after petitioner's original factory building was completed in 1961, the concrete floor began to crack in a number of places. As a result of this condition, petitioner's machinery had to be realigned sev-

[7] See also *Harvey K. Jacskon*, T.C. Memo. 1961–227.

eral times a year, resulting in a loss of 20 hours of production time whenever realignment was necessary. In 1962 and early 1963, petitioner received estimates on the cost of repairing the floor and the limited probability of success in permanently eliminating this condition. Because of the prohibitive cost of such repairs (plus an estimated 5 to 6 weeks of lost production time), no definite plan to carry out these repairs was ever formulated nor have such repairs as yet been undertaken.

On January 2, 1967, petitioner's board of directors approved the following plans and related expenditures:

(1) Build an addition to the present factory building on the south and having a minimum floor area of 5,000 square feet at an estimated cost of $50,000.00.

(2) Install and place in service one 3½'' extruder line for wire and cable at an estimated cost of $45,000.00.

(3) Install and place in service one 2½'' extruder line for rigid and flexible plastic tubing, together with vacuum sizing and haul-off equipment, estimated cost of $42,000.00.

(4) Purchase and install 10 wire braiding machines, total cost of $18,000.00.

(5) Purchase marking machines, respooler and accessory equipment, cost $10,000.00.

(6) Purchase a new delivery truck, $3,200.00.

(7) Purchase and install one 1½'' Killion nylon extruder for wire coating, $6,000.00.

(8) Obtain bids and engineering data on one planetary cabling machine line for installation in 1968 or 1969, $80,000.00.

(9) Obtain bids and engineering data on a vertical taping machine at $7,500.00 and one wire striping machine at $6,000.00.

From 1967 through 1969, petitioner spent $124,278 for plant expansion, as follows:

| | |
|---|---|
| Building addition completed and paid for in July 1967 | $38,595.00 |
| Other charges to building account (#159) in 1967 | 155.00 |
| Charges to machinery and extrusion equipment account (#152) in 1967 | 5,750.00 |
| Total charges 1967 | 44,500.00 |
| Sterlin Extruder and accessory equipment purchased on Sept. 9, 1968, received and charged to account #152 during 1968 and 1969 | 65,840.50 |
| Other equipment purchased, received and charged to account #152 during 1968 and 1969 | 13,937.50 |
| Total | 124,278.00 |

No further steps have been taken along the lines set out above in the January 2, 1967, minutes, nor has petitioner ever obtained any formal estimates in regard to these proposals.

The following shows in summary form the assets and liabilities of petitioner at the close of the taxable years indicated:

| | 1965 | 1966 | 1967 |
|---|---|---|---|
| *Current assets* | | | |
| Cash | $150,097 | $184,950 | $150,333 |
| Accounts receivable | 85,928 | 100,548 | 90,797 |
| Inventories: | | | |
| Raw materials | 121,363 | 46,653 | 87,244 |
| Finished goods and work in progress | 25,965 | 6,727 | 12,506 |
| U.S. Treasury notes | --------- | 394,644 | [8]400,000 |
| Miscellaneous | 3,065 | 5,250 | 6,253 |
| Total current assets | 386,418 | 738,772 | 747,133 |
| *Fixed assets* | | | |
| Cost | 319,636 | 344,781 | 389,930 |
| Less accumulated depreciation | (88,619) | (113,943) | (136,915) |
| Book value | 231,017 | 230,838 | 253,015 |
| Land | 44,000 | 44,000 | 44,000 |
| Total fixed assets | 275,017 | 274,838 | 297,015 |
| Total assets | 661,435 | 1,013,610 | 1,044,148 |
| *Liabilities* | | | |
| Current liabilities | 81,801 | 222,905 | 124,794 |
| Long-term liabilities | 67,504 | 54,575 | 54,574 |
| Total liabilities | 149,305 | 277,480 | 179,368 |
| Capital stock | 100,000 | 100,000 | 100,000 |
| Retained earnings | 412,134 | 636,130 | 764,780 |
| Total liabilities and net worth | 661,439 | 1,013,610 | 1,044,148 |

In 1966, petitioner's net income after taxes (exclusive of any adjustments necessitated by our disposition of the first two issues herein) amounted to $223,996.

Since 1958 and through the taxable year 1966, no stockholder or officer of the petitioner borrowed any funds from petitioner or had any loans due to petitioner.

Prior to the mailing of the notice of deficiency herein on February 27, 1970, respondent sent by certified mail, on February 13, 1969, a notification pursuant to section 534(b). Petitioner, pursuant to section 534(c), submitted, on April 11, 1969, a timely statement, on which it relies herein, to establish that all or part of its earnings and profits for the taxable year 1966 were not permitted to accumulate beyond the reasonable needs of the business. In such statement, petitioner listed the following grounds:

(1) Increase in depreciation reserve due to excess of depreciation on replacement cost over depreciation on historical cost.

(2) Plant expansion, including addition to factory building and machinery purchased and installed.

---

[8] The figure in the tables submitted by the parties shows $40,000 but, from other evidence in the record and the stipulated figure for total assets, it is apparent that the correct figure is $400,000.

(3) Reserve for tax deficiencies, plus interest thereon and estimated attorneys' fees.

(4) Contemplated factory floor rebuilding.

(5) Obligation to retire long-term debt.

(6) Increased working-capital requirements for inventories and accounts receivable due to expected increased sales.

(7) Reinstatement of depleted inventories, taking into account anticipated price increases for copper due to strike.

(8) Procurement of inventories from anticipated release of U.S. Government stockpile.

Petitioner synthesized the foregoing elements as follows:

| | |
|---|---:|
| Retained earnings as at 12/31/66 | $636,130 |
| Less item (1) above | 18,000 |
| Adjusted retained earnings | 618,130 |

*Cash requirements*

| | |
|---|---:|
| Current liabilities | 222,905 |
| Plant expansion in 1967 | 124,278 |
| Income tax deficiencies | 87,946 |
| Factory floor rebuilding | 93,180 |
| Reinstatement of depleted inventories | 75,644 |
| Procurement of emergency copper supplies (minimum) | 40,000 |
| Total | 643,953 |
| Availabilities of cash and U.S. Treasury notes | 579,594 |

Petitioner noted, in its statement, that the above cash requirements were before providing for any increase in the average level of inventories and receivables (see item 6, above).

Respondent, in his notice of deficiency and in the computation of the accumulated-earnings credit under the provisions of section 535(c), accepted petitioner's grounds as to its business needs for working capital and to cover plant expansion, reserve for tax deficiencies, and obligation to retire long-term debt and computed petitioner's accumulated-earnings tax as follows:

| | | | |
|---|---:|---:|---:|
| Total needs of business: | | | |
| Ordinary operating expenses for one cycle | | [9]$228,537 | |
| Anticipated extraordinary expenditures for: | | | |
| Plant expansion | $124,278 | | |
| Attorney's fees | 10,000 | | |
| 1963–65 income tax, deficiencies, penalty, and interest | 77,946 | | |
| Retirement of mortgage debt | 54,575 | 266,799 | $495,336.00 |

| | | |
|---|---|---|
| Less: Available working capital if all current year's earnings and profits, after taxes, were distributed: | | |
| Net liquid assets available at 12/31/66_____ | 515, 867 | |
| Less: Year 1966 taxable income as corrected_____ 471, 001 | | |
| Federal income tax_____ (192, 321) | | |
| Deduction for dividends_____ (51, 073) | 227, 607 | 288, 260. 00 |
| Year 1966 accumulated-earnings credit_____ | | 207, 076. 00 |
| The accumulated-earnings tax computation is computed as follows: | | |
| Year 1966 taxable income as corrected [10]_____ | | 471, 001. 00 |
| Less: | | |
| Federal income tax_____ 192, 321 | | |
| Dividends-paid deduction_____ 51, 073 | | |
| Reasonable needs of business_____ 207, 076 | | 450, 470. 00 |
| Accumulated taxable income_____ | | 20, 531. 00 |
| Accumulated-earnings tax (27½% of $20,531.00)_____ | | 5, 646. 03 |

ULTIMATE FINDING OF FACT

In 1966, petitioner did not permit its earnings and profits to accumulate beyond the reasonable needs of its business.

OPINION

At the outset, there are certain preliminary problems which require disposition. Petitioner has asserted that its statement filed pursuant to section 534(c) operated to shift the burden of proof to respondent. See *Chatham Corp.*, 48 T.C. 145 (1967). Our ultimate finding of fact herein, in favor of petitioner, has been made on the assumption that that burden remained with petitioner and, consequently, there is no need for us to deal with petitioner's claim in this regard.

Respondent, in his opening statement at the trial, sought to claim that any compensation paid to Isenberg and found by the Court to be excessive should be treated as a preferential dividend in view of the stipulation of the parties that Isenberg owned only 95 percent of the stock of petitioner (the balance being owned by his wife). Cf., e.g., *Wm. J. Lemp Brewing Co.*, 18 T.C. 586, 600 (1952). Respondent did not press the matter at trial but has renewed his contention on brief.

---

9 Calculated in accordance with the so-called *Bardahl* formula (*Bardahl Manufacturing Corp.*, T.C. Memo. 1965-200). See also *Magic Mart, Inc.*, 51 T.C. 775, 791–794 (1969). In its calculation herein, respondent allowed for an inventory requirement in the amount of $147,328, representing the value of petitioner's closing inventory at Dec. 31, 1965, which was the highest in petitioner's history since 1962 and should be compared with the figures of $53,380 as of Dec. 31, 1966, and $99,749 as of Dec. 31, 1967.

10 Respondent's calculations assumed the correctness of his determination on the first two issues raised herein.

The consequence of our acquiescence in respondent's position would be to disallow the dividends-paid deduction, with which respondent credited petitioner in his deficiency notice, to the extent of $32,234 of compensation which we have found to be unreasonable herein and to increase the amount of income purportedly subject to the tax under section 531 by an equivalent amount. It seems obvious to us that, in acceding to the stipulation as to stock ownership, petitioner relied on the dividends-paid deduction set forth in the deficiency notice and that, in the circumstances, it was not afforded adequate opportunity to ask to be relieved of the stipulation and offer evidence directed to the issue so belatedly raised by respondent. Consequently, we reject respondent's assertion and do not decide the issues as to whether the amount of Isenberg's compensation determined to be excessive should be treated as a dividend and consequently whether it should be treated as a dividends-paid deduction.[11]

We now turn to the basic question for decision, namely, did petitioner in 1966 permit its earnings and profits to accumulate beyond the reasonable needs of its business? Petitioner's accumulated earnings at the end of that year amounted to $636,130, of which $515,867 represented net liquid assets. Against this latter amount, respondent credited $124,278, representing actual expenditures for plant expansion, $54,575, representing long-term debt obligations, and $87,946, representing reserves for tax deficiencies (including attorney's fees). These three items cover the major portion of three of the eight items contained in petitioner's section 534 statement and reiterated at trial.[12] Additionally, respondent gave petitioner credit for $228,537, representing working-capital needs, and, in so doing, purported to take into account three other items set forth in petitioner's section 534 statement, namely, increased requirements for such capital, reinstatement of inventories, and procurement of copper from the Government stockpile. Respondent made no allowance for the remaining two items in the section 534 statement. The net effect of the foregoing credit was to reduce petitioner's purportedly unreasonable accumulations of earnings to $20,531 out of total accumulations of $636,130.

---

[11] We note that respondent carefully circumscribes his assertion in this regard by disclaiming an increased deficiency, as to which he, of course, would have the burden of proof. We also note that, although we have only sustained in part respondent's disallowance of Isenberg's compensation, the amount of income purportedly subject to the sec. 531 tax remains the same, since the effect of our action is to decrease respondent's determination of petitioner's taxable income prior to the dividends-paid deduction and the deduction itself by the same amount.

[12] The specifically planned expansion needs set forth in the directors' minutes of Jan. 2, 1967, aggregated a far larger sum, but petitioner did not, in its sec. 534 statement, articulate any such need beyond the amount allowed by respondent. Consequently, the burden of proof for any increased need remained on petitioner in any event, but at the trial it produced no evidence whatever on this point.

The margin of petitioner's error, on the basis of respondent's own figures, is small indeed. We recognize, of course, that this, in and of itself, cannot absolve petitioner—a miss is as good as a mile. But, in this case, we have an important additional factor. In 1966, an actual strike in foreign copper mines had occurred and, as of the close of the year, there existed the prospect of a domestic copper strike, the length and impact of which defied any precise prediction. The resulting economic turmoil in the copper industry and its potential effect upon petitioner's business in terms of availability of supplies, ability to satisfy customers, and prices of both purchases and sales seem obvious. The domestic strike, in fact, occurred and lasted for 8 months. Under such circumstances, the normal cash flow utilization contained in the *Bardahl* formula for determining working-capital needs may not provide sufficient flexibility to meet cash requirements; cash generated by current sales (which may, at any given moment, be low due to inventory shortages) may well be insufficient to cover purchases of raw materials whenever and wherever they become available, to say nothing of the accompanying increased price demands of suppliers. Granted that respondent may have made a generous inventory allowance [13] in computing petitioner's working-capital needs and that the evidence as to the impact of the copper strikes is not as neat and tidy as it might have been, we are satisfied that respondent's analysis does not adequately take into account the vagaries of the market situation in which petitioner expected to, and did, find itself at the end of 1966. We think that respondent's divining rod operates with an unnatural precision. We have a less sharply etched perception—one perhaps more attuned to the real world. Under the circumstances herein, we will not substitute our business judgment for that of corporate management to hold that petitioner did not require an additional $20,531 of accumulated earnings. See *Faber Cement Block Co.*, 50 T.C. 317, 329 (1968).[14] As we have previously stated, "we must keep the whole forest in mind, not merely the individual trees." See *Magic Mart, Inc.*, 51 T.C. 775, 792 (1969).

In light of this conclusion, we need not deal with the other elements in petitioner's case in respect of its needs for an increased depreciation reserve, for repairing its factory floor, and for still further increases in its working-capital requirements—elements which we are constrained to say lack persuasive force upon the basis of the evidence

---

[13] That allowance included valuing petitioner's inventory requirements at its highest historical level. See fn. 9 *supra*.

[14] See also *Defiance Lumber Co.*, a Memorandum Opinion of this Court dated July 8, 1953 (12 T.C.M. 808, 813) ; *Smokeless Fuel Co.*, a Memorandum Opinion of this Court dated Sept. 20, 1943.

600

before us. Compare *Magic Mart, Inc., supra* at 795–797; *Faber Cement Block Co., supra* at 332–333.

We thus conclude that petitioner has fully sustained its burden of proof (which we have assumed *arguendo* was upon it) and has shown that the accumulation of all its earnings and profits, as at December 31, 1966, was required by the reasonable needs of its business. Such being the case, we have no need, in light of the credit provided for in section 535(c)(1), to consider whether the proscribed purpose of avoiding income tax may have existed. See *Magic Mart, Inc., supra* at 799; *Faber Cement Block Co., supra* at 336.

It goes without saying that our conclusion herein extends only to the taxable year 1966. It obviously has no bearing on petitioner's possible vulnerability in subsequent years, which will have to be determined in light of the facts and circumstances as they exist in those years.

*Decision will be entered under Role 50.*