MEDICAL COLLECTION CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent ROBERT J. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Medical Collection Corp. v. Commissioner
Docket Nos. 3652-75, 3653-75.
United States Tax Court
T.C. Memo 1977-266; 1977 Tax Ct. Memo LEXIS 178; 36 T.C.M. (CCH) 1074; T.C.M. (RIA) 770266; August 11, 1977, Filed *178 Held: 1. Amount of reasonable compensation paid by Medical Collection Corporation to Robert J. Smith determined. 2. Respondent has not proved that Medical Collection Corporation willfully paid petitioner Smith compensation in excess of that allowed by Executive Order 11640, issued pursuant to the Economic Stabilization Act of 1970; accordingly, sec. 162(c)(2), I.R.C. 1954, does not apply. 3. Since petitioner Smith rented certain property to Medical Collection Corporation without a profit motive, deductions are not allowable under secs. 162 and 212, I.R.C. 1954. 4. Petitioner Smith may not deduct a portion of the rent on his apartment as a necessary business expense. 5. Deductions for alleged charitable contributions disallowed. Edward S. Smith, Lawrence M. Katz, and Joseph H. Langhirt, for the petitioners. Robert K. Dowd, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Medical Collection Corporation Calendar Year
Deficiency
1971
$56,117.63
1972
72,055.17
Robert J. Smith
1971
$ 3,760.68
1972
11,117.05
The issues are: (1) Whether the amount of compensation paid by Medical *179 Collection Corporation (hereinafter Medical) to Robert J. Smith (hereinafter Smith) during 1971 and 1972 was reasonable; (2) whether respondent has met his burden of proving that Medical willfully paid Smith compensation in excess of the amount allowed by Executive Order 11640, issued pursuant to the Economic Stabilization Act of 1970; (3) whether Smith had a profit motive in renting certain property to Medical; (4) whether Smith may deduct a portion of the rent on his apartment as a necessary business expense; and (5) whether deductions for certain alleged charitable contributions should be allowed. FINDINGS OF FACT Some facts were stipulated and are found accordingly. Petitioner in Docket No. 3653-75 is Robert J. Smith who lived in Baltimore, Maryland, when he filed his petition in this case. Smith filed his 1971 and 1972 income tax returns with the Internal Revenue Service Center, Philadelphia, Pennsylvania. He maintains his books and records and files his income tax returns on the cash receipts and disbursements method of accounting. Petitioner in Docket No. 3652-75, Medical Collection Corporation, is a Maryland corporation. Its principal office was in Baltimore, Maryland, *180 when it filed its petition in this case. From its incorporation through the years in issue, Medical was engaged in the collection of delinquent accounts receivable. It maintains its books and records and files its income tax returns on a calendar year basis, using the accrual method of accounting. At all times pertinent hereto Smith has owned all of Medical's outstanding shares and was its president. Smith is also president of Commercial Collection Corporation (hereinafter Commercial), a Maryland corporation. From its incorporation through the years in issue, Commercial was engaged in the collection of delinquent accounts receivable. Commercial maintains its books and records and files its income tax returns on a calendar year basis, using the accrual method of accounting. At all times pertinent hereto, Smith has owned all of Commercial's outstanding shares and was its president. Commercial claimed the following amounts as deductions for compensation for Smith's services during 1971 and 1972: Straight
Accrued
Profit
Salary
Salary
Sharing
Pension
Total
1971
$2,600.00
$ 2,600.00
1972
5,000.00
$47,012.42
$7,801.86
$5,201.24
65,015.52
Commercial had one person (Smith) on its payroll on December *181 31, 1971, and two in 1972 (Smith and James A. Carll). Carll was paid approximately $14,700 in 1972. Commercial was organized in 1966 to provide an appropriate name to handle commercial accounts other than those in the medical field. Medical claimed the following amounts as deductions for compensation for Smith's services from 1965 through 1972: Straight
Accrued
Profit
Salary
Salary
Sharing
Pension
Total
1965
$ 5,455.00
$ 5,455.00
1966
10,400.00
10,400.00
1967
15,600.00
15,600.00
1968
31,000.00
31,000.00
1969
31,000.00
31,000.00
1970
18,000.00
$14,245.82
$ 4,836.86
37,082.68
1971
18,000.00
128,014.16
21,902.09
167,916.25
1972
18,000.00
141,127.13
23,869.07
$15,912.71
198,908.91 Smith started Medical in 1965 without any other employees. After many disappointments he obtained some accounts from Mercy Hospital and worked almost exclusively for them for nine months in 1965 and 1966. In 1966 he sold his services to St. Joseph's Hospital, and his business has continued to grow each year. After some time Smith hired one, then another, part-time employee, who together provided a total of about 30 hours of clerical assistance a week. By 1970 there were 17 employees. On December 31, 1971, Medical had 24 people on its payroll. *182 On December 31, 1972, it had 32 people on its payroll. Medical's clerical employees record new business as it comes in, record cash receipts, and answer incoming calls. They work a five-day, forty-hour week and are paid the going rate for the jobs they hold. It is very routine, boring work, and there is considerable turnover.
In 1972 Smith employed Robert J. Tabeling, who interviewed job applicants and gave general assistance for about four months. Tabeling had been a friend and advisor to Smith from the time they were both employed at the Johns Hopkins Hospital in 1963. Prior to his formal employment at Medical in 1972 Tabeling had from time to time performed services for Smith, including closing his books and examining his financial statements and his records. In the collection business, a "placement" is one delinquent account, regardless of amount. Historically these debts are usually a year to two years old when "placed" with a collection agency. Hospitals are reluctant to put pressure on their patients to pay their bills. The newer accounts, some of which may be only six months old, are more desirable and require more competitive sales effort to obtain. After placement *183 the client is furnished an acknowledgment showing the date of service, an account number for each placement, and the balance due. The agency then puts the account, regardless of size, through a series of collection notices or letters (the terms are synonymous in this case). These notices were issued manually during 1971 and 1972. Medical receives many complaints from debtors, mainly that the bill has been paid. If the complaint is that the bill has been paid to the client, the debtor is requested to call the client and have the client confirm to the agency that payment of the specific account has been made. Or the debtor will be requested to furnish a copy of his cancelled check. The majority of clients will not answer inquiries from the agency requesting confirmation of a debtor's claim of payment. If proof of payment is furnished, the account is closed. If the client replies that the debtor has not paid the specific account, as, for example, when there may be several accounts of the same debtor in similar amounts, the account remains open. Without proof of payment from either the client or the debtor, the account remains open. The bulk of the collections results from the *184 letters and notices. The older accounts, although requiring perhaps less sales ability to obtain, require more effort and ingenuity to collect. For example, Smith once tried to persuade the controller of Johns Hopkins Hospital to give him some placements, and as a test was given a $36,000 account of a debtor who had been dead for over a year. Smith personally pursued the matter, discovered that the professed insolvency of the estate was untrue, and collected the account, earning a $14,000 commission. Sensing that the doctors on the case had not been paid either, he got them to place their accounts with him; he collected on these accounts and earned an additional $1,200. The single most important element in the collection business is salesmanship, that is, the ability to convince prospective clients that they should place their delinquent accounts with a given collection agency. The approval of collection agencies rests with the hospital controller, but the placements usually are assigned by the billing office. Smith's employees consider him to have exceptional intelligence, persistence, sales acumen, efficiency and managerial ability, the ability to train, lead and motivate his *185 employees, and to be completely dedicated to and knowledgeable in his business. From the beginning Smith has worked hard to collect for his clients. He has succeeded in producing better results than his competitors and received higher commissions because of those results. He has never compromised on getting results or higher commissions and even in the early and difficult days would let a client drop him rather than lower his commission rates as competitors have done. In about 1970 Smith had brought the business to a point where more and more detail work was being done by others, and he could devote more time to selling, organizing, and management, especially sales. In late 1970 or early 1971 Smith was able to sell the Johns Hopkins in-patient billing office on placing $1,232,494 with his collection agency during 1971, a great increase from only $526.93 in 1970. The increase in Smith's compensation after 1970 was directly related to his release from detail work, his ability to get out and sell, to contain expenses, and to make collections. From 1965 through 1973, Medical paid no dividends. It paid no Federal income tax for 1971 and 1972, for Smith took as much in compensation *186 as he could, leaving Medical without capital. Smith has always devoted long hours to his business, working nights and weekends. From 1965 through 1970 he took no time off for vacation. His collection business is practically his only interest, and he has no outside hobbies. By late 1970, the solid establishment of Smith's business, his release from detail work, and his increased knowledge, experience and sales ability began to pay off. His placements and their value increased as follows: Year
No. of Placements
Total Account Value
1970
58,276
$2,700,000
1971
82,213
4,689,000
1972
186,289
7,000,000 Medical sent collection letters to debtors which informed debtors that notice of debt would be sent to their employers. On February 12, 1973, Medical entered a cease and desist agreement with the Attorney General of Maryland in which it agreed to discontinue such letters. Medical had no corporate meetings from 1966 through 1969. Medical is one of the five largest collection agencies in Baltimore. Another is Collection and Investigation Bureau of Maryland, Inc. (hereinafter CIB). S. Bruce Elleison (hereinafter Elleison) is president and sole stockholder and was such during the years in issue. *187 In 1973 CIB had 15 to 20 employees, of whom one was a sales representative. This sales representative was paid a flat $200 per week salary for sales and public relations. The other employees had comparable duties to the clerical employees of Medical. CIB had no pension or profit sharing plan. CIB operates only in Maryland and has no office outside of Baltimore.
Elleison delegated management of CIB from 1967 through 1971 and the business declined. In January of 1972 he again assumed active management himself. In 1971 and 1972 Elleison devoted about 30 hours a week to the collection business, and in excess of 50 hours in 1973. In 1973 Elleison was general manager of CIB. About 10 percent of his time was devoted to sales, the balance to management. Elleison had an office at CIB from which he conducted most of his business. Theseheadquarters were about 3 blocks from the headquarters of Medical. The rent paid by CIB was $36,000 per year. Ninety-five percent of CIB's placements were health-oriented and the rest were commercial. CIB used letters and telephones to contact debtors. The gross receipts of CIB for 1973 were $305,547. Deductions were $271,119, of which officers salaries *188 were $41,600. Elleison received $28,600 of the $41,600 and his wife received the remaining $13,000. Postage cost $30,599, telephone $9,522, data processing $17,417, and legal and accounting $2,350. Elleison also had the use of an automobile of approximately $5,000 value. The net income of CIB for 1973 was about $35,000; retained earnings were about $125,000. In 1974 there was a net loss of $30,000. In 1972 Elleison was CIB's only sales representative. Gross receipts were approximately $200,000 to $250,000. There were fewer employees than in 1973, but the expenses were probably proportionate to gross receipts in the same ratio as 1973. CIB does not do flat rate work. Its commission rates in 1973 were 50 percent for accounts under $18 and 35 percent for accounts over $18. CIB does not provide any service other than collection. Its business was converted in 1974 to a more sophisticated computer operation than the one it previously had. In 1971 and 1972, Smith owned certain real property situated at 2203 Maryland Avenue, Baltimore, Maryland, consisting of a one-story and basement-level cinder block building. During 1971 and 1972, Smith rented the building to Medical for use *189 as its principal business office. Smith reported the following amounts of rental income, related deductions, and net loss on his returns for the years in question: 1971
1972
Rental income
$2,510.84
$2,551.72
Depreciation
4,287.82
3,228.95
Real property taxes
991.88
1,032.76
Mortgage interest
783.82
738.45
Net loss
(3,552.68)
(2,448.44)
Aside from his interest in Medical and Commercial, this was Smith's only other business interest during 1971 and 1972. The adjusted basis of Smith's property at 2203 Maryland Avenue at the beginning of 1971 was $25,749.74, of which $3,932.10 was ascribed to land value. The building is approximately 25 feet wide and 66 feet long, with a total floor space of approximately 3,300 square feet. It contained no space for off-street parking.It did contain a private office. The property adjacent to Smith's property was 40 feet wide and 100 feet long, of similar construction, with a total floor space of approximately 6,500 square feet. During the years in issue it was air conditioned, about one-half the floor area was carpeted, and it had off-street parking facilities for ten automobiles. The operators of the business there paid an annual rent of $9,000 in 1971 and 1972 *190 plus repairs of about $500 to $600 each year. The building was owned by a corporation, the stockholders of which were also the stockholders of the corporation which operated an office equipment sales and service business on the premises. Smith paid $3,207.51 for his apartment in 1971, and $3,709.66 in 1972. Smith deducted 50 percent of the expense of his apartment as an ordinary, necessary, and reasonable business expense of carrying on his business for 1971 and 1972 in the respective amounts of $1,603.76 and $1,854.83. Respondent disallowed the deduction of these amounts in full. Smith's apartment was located in downtown Baltimore about twenty blocks from the principal offices of the collection business. It was a one-bedroom apartment with kitchen, bathroom, cupboard, and a combined living room-dining area in which Smith kept a file cabinet, a desk, a typewriter, and a telephone. The entrance and exits to the apartment were under 24-hour surveillance with guards and television cameras, and no one could gain access except by an electronic button operated by the doorman. The apartment was used during 1971 and 1972 for employee meetings, for interviewing applicants, for telephoning *191 employees, and for conferring with clients. Smith deducted $425 in charitable contributions on his 1971 return. Respondent disallowed this deduction in full, consisting of $350 to St. Agnes Catholic Church and $75 to miscellaneous charities. Smith deducted $1,300 in charitable contributions on his 1972 return. Respondent disallowed $1,050 of this deduction, consisting of $950 to St. Agnes Catholic Church and $100 to miscellaneous charities. Respondent allowed $250 in other contributions for 1972 for which Smith had cancelled checks. ULTIMATE FINDINGS OF FACT The reasonable compensation paid by Medical to Smith was $125,000 for 1971 and $135,000 for 1972. Smith rented certain property to Medical without a profit motive. OPINION The first issue is whether the compensation paid to Medical's president and sole shareholder, Robert J. Smith, was reasonable for 1971 and 1972. Respondent contends that reasonable compensation for Smith was $40,000 for 1971 and $42,000 for 1972. Medical contends that reasonable compensation for Smith was $167,916.25 for 1971 and $198,908.91 for 1972, as claimed on Medical's tax returns. Section 162(a)(1) provides that "a reasonable allowance for salaries *192 or other compensation for personal services actually rendered" shall be allowed as a deduction as a business expense. The reasonableness of compensation presents a question of fact to be resolved by the facts and circumstances of each case. Miles-Conley Co. v. Commissioner,173 F. 2d 958 (4th Cir. 1949), affg. 10 T.C. 754 (1948). Respondent's determination of reasonableness is presumptively correct; petitioner has the burden of proving that a larger amount is reasonable. Miles-Conley Co. v. Commissioner,supra."There are no fixed rules or exact standards for determining what constitutes reasonable compensation, for each case must be resolved on its own particular facts and circumstances." Perlmutter v. Commissioner,44 T.C. 382, 401 (1965), affd. 373 F. 2d 45 (10th Cir. 1967). Although "[there] are no fixed rules or exact standards for determining what constitutes reasonable compensation," the case of Mayson Mfg. Co. v. Commissioner,178 F. 2d 115, 119 (6th Cir. 1949), lists a number of the basic factors which this Court has, in the past, considered in reaching its conclusion: Such factors include the employee's qualifications; the nature, extent and scope of the employee's *193 work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * There are a number of these factors which are clearly in Medical's favor. Smith built Medical himself. In 1965 when he started the company, he was its only employee. By 1972 there were 32 employees. Smith also worked very hard, including nights and weekends. From 1965 through 1970 he took no vacation. The collection business was practically his only interest; he had no outside hobbies. Furthermore, Smith was an excellent salesman who managed to acquire a large number of "placements" from various hospitals. A placement is one delinquent account, regardless of amount. These placements are obviously Medical's lifeblood for without them Medical has no reason for existing. *194 In addition, Smith showed great ingenuity in collecting accounts. For example, he was given a $36,000 account of a debtor who had been dead for over a year. He personally pursued the matter, discovered that the professed insolvency of the estate was untrue, and collected the account, earning a $14,000 commission. Finally, Smith constantly worked to improve Medical's operation and had the respect of the people that worked for him. In short he was an excellent manager. This, of course, is only a summary of Smith's accomplishments; they are more fully described in the Findings of Fact. While we recognize Smith's accomplishments, we also recognize the merits of respondent's case.Medical paid no dividends during the years in question, Perlmutter,supra at 402. Smith received $2,600 as compensation from Commercial Collection Corporation in 1971 and $65,015.52 in 1972. Midland Ford Tractor Company v. Commissioner,277 F. 2d 111 (8th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 364 U.S. 881 (1960). Smith's salary must be subject to close scrutiny since he was in control of Medical's affairs. Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). Smith *195 took as much compensation as he could each year, leaving Medical without capital. After careful consideration of the entire record and after comparing Medical's operation to that of Collection and Investigation Bureau of Maryland, Inc., we find that reasonable compensation for Smith for 1971 was $125,000 and that reasonable compensation for 1972 was $135,000. Respondent makes an argument which, if valid, would have affected the amount of the reasonable compensation paid to Smith. We do not think, however, that it is valid; accordingly, it does not affect the amount of Medical's deduction. While it is not a valid argument, it is nevertheless original and merits discussion. Respondent argues that Medical's financial success was not due to any special or unique performance by Smith but rather was the result of improper and unethical collection letters issued by Medical. [1] Medical, for example, sent collection letters to debtors which informed debtors that notice of the debt would be sent to their employers. On February 12, 1973, Medical entered a cease and desist agreement with the Attorney General of Maryland in which it agreed to discontinue such letters. We must reject respondent's *196 argument since there is no evidence to support his theory that debtors paid more of their hospital bills (thus insuring Medical's success) because of Medical's alleged strongarm tactics. Many factors can contribute to the determination of reasonable compensation. Those that we have considered in this case are fully supported by the record and are described in the Findings of Fact. On the evidence before us we simply cannot say that Medical's success was dependent upon improper and unethical letters; we cannot make such a finding of fact. On the second issue, respondent argues that the compensation paid to Smith in 1971 and 1972 was illegal under the Economic Stabilization Act of 1970 and thus is not deductible under section 162(c)(2)[2] *198 to the extent that such compensation exceeded $39,122.23 and $41,273.95 [3] for 1971 and 1972, respectively. Respondent recognizes, pursuant to section 162(c)(2), that he has the burden of proof on this issue *197 to the same extent as he bears the burden of proof in a fraud case. Respondent must prove fraud by "clear and convincing evidence." Beaver v. Commissioner,55 T.C. 85, 92 (1970). Respondent's argument, as more fully set out below, hinges upon the interplay between the Economic Stabilization Act of 1970, executive orders issued pursuant to that act, and section 162(c)(2). Section 1(a) of Executive Order 11640, issued pursuant to the authority of the Economic Stabilization Act of 1970, provides in part as follows: No person shall charge, assess, or receive, or knowingly pay or offer to pay, directly or indirectly, in any transaction, prices or rents in any form higher than those permitted hereunder, and no person shall, directly or indirectly, pay or agree to pay, in any transaction, wages or salaries in any form, or to use any means to obtain payment of wages and salaries in any form, higher than those permitted hereunder, whether by retroactive increase or otherwise. Section 16(a) of that same executive order provides in part as follows: Whoever willfully violates this Order or any order or regulation *199 issued under authority of this Order shall be subject to a fine of not more than $5,000 for each such violation. Section 162(c)(2), as set out above, disallows a business deduction under section 162(a) for any illegal payment under any law of the United States which subjects the payor to a criminal penalty. Respondent contends that Medical willfully paid Smith salary in excess of that permitted by Executive Order 11640, that this subjects Medical to the criminal sanction of section 16(a) of Executive Order 11640 and that, accordingly, such excessive salary is not deductible pursuant to section 162(c)(2). Respondent's contention that Medical willfully paid Smith excessive salary is based upon his allegation that Smith conducted Board of Directors meetings in 1972 and backdated some of the documents to 1971 to avoid the wage freeze of the Economic Stabilization Act of 1970. It is not clear from the record that there was backdating of any corporate minutes and even if there was, this is certainly not "clear and convincing evidence" that Medical willfully violated the Economic Stabilization Act of 1970. Smith built Medical from nothing in 1965 to a very successful corporation by 1971. *200 It is clear from the record that Smith ran Medical rather haphazardly for a number of years. For example, from 1966 through 1969 there were no corporate minutes; Smith testified that he thought they were "silly" since he considered himself to be Medical. This pattern of conducting business may have continued through 1972 (although it is not clear, as stated above, that there was backdating from 1972 to 1971 of corporate minutes). Even if we assume that there was such a backdating, it would be unacceptable to isolate the 1971 minutes from the general pattern of poor business practices and say that the backdating of these minutes indicates willful violation of the law.
The third issue is whether Smith rented some of his own property to Medical for office space with a profit motive.A profit motive must be present for deductions to be allowable under section 162 or 212. Hirsch v. Commissioner,315 F. 2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. Considering all the evidence on this issue, we do not think Smith had the necessary profit motive. The rental income was only $2,510.84 in 1971 and $2,551.72 in 1972 for floor space of approximately 3,300 square feet. *201 The rent for the adjacent property with floor space of 6,500 square feet in each of 1971 and 1972 was $9,000 plus repairs which averaged $500 or $600 per year. Furthermore, Smith testified that the rent was based solely on his mortgage payments plus taxes. The fourth issue is whether Smith properly allocated 50 percent of the cost of his apartment to the necessary expense of conducting his business. We apply the rule in Bodzin v. Commissioner,509 F. 2d 679 (4th Cir. 1975), revg. 60 T.C. 820 (1973), since, if appealed, this case would be reviewed by the Court of Appeals for the Fourth Circuit. After reviewing Bodzin, we have concluded that Smith may not deduct 50 percent of the rental of his apartment as a business expense. Smith makes two arguments to support his deduction. He first says that Medical's office was unsuitable for having confidential meetings with clients. This seems unfounded for one of the pictures of the office introduced into evidence shows what appears to be a suitable private office in the background. Smith also alleges that his office lacked security for confidential documents and that his apartment had a 24-hour guard service which would protect his *202 papers. It may well be that Smith's office cannot presently protect his confidential documents, but we simply will not allow him deductions of approximately over $1,600 in 1971 and $1,800 in 1972 when petitioner's problem can be solved by buying himself a good, solid safe. We think that, on the whole, Smith's office was adequate (or easily could be made so) and that his use of his apartment was for personal convenience. The last issue involves charitable contributions allegedly made by Smith. Smith deducted $425 in charitable contributions on his 1971 return. Respondent disallowed this deduction in full for lack of substantiation. Smith deducted $1,300 in charitable contributions on his 1972 return. Respondent disallowed $1,050 of this amount, again for lack of substantiation. The only evidence that Smith presented at trial on this issue was his wholly unverified oral testimony that he did indeed contribute the amounts he deducted on his return. We hold that this evidence is alone insufficient to meet petitioner's burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Accordingly, respondent's determination is sustained. *203 Decisions will be entered under Rule 155. Footnotes
1. Petitioner submits that respondent has the burden of proof on this issue. To use the phrase "burden of proof" misses the point. This is merely an argument that respondent is offering to support his case on the issue of reasonable compensation.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (c) Illegal Bribes, Kickbacks, and Other Payments.-- * * *
(2) Other illegal payments.--No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary or his delegate to the same extent as he bears the burden of proof under section 7454(concerning the burden of proof when the issue relates to fraud). 3. This is a separate issue from the reasonable compensation issue discussed above. Accordingly, respondent is not taking inconsistent positions with respect to the amount of reasonable compensation.↩