CASTLE FORD, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Castle Ford, Inc. v. Commissioner
Docket No. 10101-75.
United States Tax Court
T.C. Memo 1978-157; 1978 Tax Ct. Memo LEXIS 357; 37 T.C.M. (CCH) 692; T.C.M. (RIA) 780157; April 24, 1978, Filed Ronald H. Grossman and Robert E. Remmel, for the petitioner. David R. Smith, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: The respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1971
$39,815.77
1972
44,789.57 The sole issue remaining for decision is the extent to which amounts paid by Castle Ford, Inc., to its president and sole shareholder constitute reasonable compensation for services performed and are deductible as such under section 162(a)(1). [1]
*358 FINDINGS OF FACT Some of the facts have been stipulated, and these facts, including the stipulated exhibits, are found accordingly. Petitioner is a New York corporation and had its principal place of business at Herkimer, New York, at the time of the filing of its petition herein. It filed its tax returns for the years involved herein with the Internal Revenue Service Center, Andover, Massachusetts. Petitioner's business activity encompasses all phases of the retail automobile business, including the sale and servicing of new automobiles and trucks, the purchase, reconditioning, sale, and servicing of used automobiles and trucks, the sale and installation of automobile parts and accessorties, the arranging of financing for automobiles and trucks sold, and the leasing of automobiles. Robert J. Castle (Castle) established an automobile dealership in 1950. In 1965, he sold the dealership to Castle Ford, Inc., whose name was subsequently changed to Thorman Ford, Inc. (hereinafter Thorman Ford). At that time, 51 percent of the Thorman Ford stock was owned by Richard Thorman (Thorman), 39 percent was owned by Frank A. Barone (Barone), and 10 percent was owned by Castle. *359 On November 30, 1969, petitioner purchased the dealership from Thorman Ford, which was then wholly owned by Thorman. At all times material herein, Castle was the president and sole shareholder of petitioner. Barone was hired by petitioner and, at all times material herein, served as its vice president and general manager. Castle was the dominant force in petitioner's operations. He formulated operating policy, which was to concentrate on the sale of used rather than new cars and to "mass-merchandise" the used cars through the use of television advertising. He personally attended two or three used car auctions weekly, at which he would estimate the value of the vehicles up for bid and decide which to purchase. After arranging for the transporation of the purchased cars from the auction to petitioner, he supervised the process of reconditioning the cars in preparation for their resale. Advertising and sales were the other areas in which Castle played a dominant role. For many years and throughout the years in question, he appeared in all of petitioner's television commercials. Individually, he sold a total of 114 cars during 1971 and 1972, and he assisted in closing deals *360 after other salesmen made the initial contact with customers. In addition, he was involved in supervising the parts and service departments, the body shop, customer relations problems, and the bookkeeping operation. Castle worked approximately 70 hours per week. His duties did not change between 1970 and 1971. During the years 1970 through 1972, petitioner paid Castle the following amounts as salary: Year
Amount
1970
$ 35,900
1971
119,300
1972
119,600
Petitioner paid Castle $300 weekly during 1971 and 1972, $103,700 on December 20, 1971, and $104,000 on December 29, 1972. These amounts were paid pursuant to agreements between petitioner and Castle entered into during January of 1971 and January of 1972, which provided as follows: It is agreed that Robert J. Castle will perform all duties as executive head of Castle Ford, Inc., including purchasing of parts and vehicles, personnel hiring, all other decisions relating to sales and other pertinent areas. For these services, Castle is to receive an annual salary of $104,000.00 payable as the company is able to pay, and $15,600.00 to be paid at a weekly rate of $300.00. It is also agreed that, in *361 the event that, as a result of Internal Revenue Service Examination, any part of the stated salary is considered excessive, that such disallowed amount will be repaid by Robert Castle to the corporation and that it will not be considered as a stockholder dividend to Robert Castle. Castle had sole and absolute authority to determine whether petitioner was "able to pay" the $104,000 specified in the employment agreements and his determination was based on the profitability of the business. In addition to salary, Castle received as compensation health insurance benefits as follows: Year
Premium paid
1970
$183.50
1971
203.10
1972
274.72
Castle set his salary for 1970 at $35,900 because he felt that time was needed to make the business sufficiently profitable to pay him the salary he deserved. This was less than the salary paid to Castle during the taxable year ending August 31, 1964, which was the last full year prior to the sale of the dealership to Thorman Ford. During 1971 and 1972, Barone was in charge of arranging financing for petitioner's customers. In addition, he was responsible for the day-to-day operation of the business when Castle was not *362 present. In that capacity, he would make decisions concerning particular agreements, oversee the reconditioning of used cars, and supervise generally the work in the repairs and parts departments. He also acted as Castle's assistant in running the business. The time devoted by Barone to each of these activities varied. When sales activity increased, supervision of the salesmen would take up more of his time. At other times, he would spend considerable time in the shop seeing that all work was being done in an orderly fashion. Generally, he worked about 60 hours per week.
During the years 1970 through 1972, Barone was paid a weekly salary of $300 and was to receive a "commission" equal to 25 percent of petitioner's net profit. Commissions totaling $46,539 and $30,335 were paid to Barone in 1971 and 1972, making his total compensation from petitioner $62,139 and $45,935 for each of those years. [2]
The dealership's operating results for the period *363 February 1, 1965, through December 31, 1972, were as follows: Net
profit
Gross
before
profit as
deducting
a Year
Units sold
Gross profit
percentage
officers' Ended
Gross sales
New
Used
from sales
of sales
salaries
Net profit
1/31/66
$1,831,934
267
695
$259,816
14.2
$ 50,648
$24,448
1/31/67
1,608,231
241
699
291,029
18.1
75,482
4,882
1/31/68
1,491,929
218
569
285,036
19.1
76,483
7,433
[1] 1/31/69 1,973,895
366
583
300,431
15.2
30,115
1,515
[2] 11/30/69 1,845,871
383
447
231,230
12.5
14,578
1,678
[3] 12/31/70 2,178,787
336
470
374,425
17.2
42,532
6,632
12/31/71
2,320,880
288
640
505,656
21.8
142,371
23,071
12/31/72
1,948,124
256
473
488,615
25.1
149,050
29,450
The used vehicle business provided a substantial portion of the petitioner's selling profit. The "selling gross profit," the "vehicle selling gross profit," and the "selling gross *364 profit attributable to used cars," based upon petitioner's Ford Dealer Statement for 1971 and 1972 were as follows: Item
1971
1972
Selling gross profit
$373,108
$313,347
Vehicle selling gross
profit
315,367
249,372
Used car gross profit
271,051
201,380
Used car profits as
percent of selling
gross profit
72.6
64.0
Used car profits as
percent of vehicle
selling gross profit
85.9
80.7
Petitioner's gross profit per vehicle sold (for both new and used cars) was well above the average profit for Ford dealers in the region in which petitioner is located. In addition to Castle's interest in and position with petitioner, he was president, a director, and 50-percent stockholder in a number of corporations which operated shopping centers, but he was not involved in their day-to-day operations.Castle was also president, a director, and sole stockholder of Castle Car Co., Inc., which leased between 15 and 20 vehicles and bought and sold three or four antique cars annually. Castle devoted a minimal amount of time to its affairs.
Castle ran for election to the United States House of Representatives in 1972. Although the major portion of his campaign *365 activities occurred at night and on weekends, he did devote some time during the business day thereto. Petitioner's dividend history for the taxable years 1970 through 1972 is as follows: Year
Date declared
Date paid
Amount
1970
1971
Nov. 19, 1971
Dec. 29, 1972
$5,000
1972
Nov. 17, 1972
Dec. 29, 1972
5,000
Respondent determined that the reasonable compensation of Castle was $35,600 in each year and disallowed the amounts paid in excess of that figure. OPINION The sole issue presented is whether amounts paid to Castle constitute reasonable compensation for services performed and are therefore deductible under section 162(a)(1). The question is one of fact to be determined from all the facts and circumstances. Charles Schenider & Co., Inc. v. Commissioner,500 F. 2d 148 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Gilman Paper Company v. Commissioner,284 F. 2d 697, 699 (2d Cir. 1960), affg. T.C. Memo. 1960-13; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977). Petitioner bears the burden of proving that the amount was reasonable. Botany Mills v. United States,278 U.S. 282 (1929); *366 Gilman Paper Company v. Commissioner,supra;Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). Where the employee receiving the salary controls the corporation and can determine his own compensation, we must closely scrutinize the arrangement to determine whether the alleged compensation is in fact a distribution of corporate profits. Darco Realty Corporation v. Commissioner,301 F. 2d 190, 191 (2d Cir. 1962), affg. T.C. Memo. 1961-110; Levenson & Klein, Inc. v. Commissioner,supra.
The factors to be considered in determining reasonableness are numerous (see Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F. 2d 176 (10th Cir. 1975)), and we see no need to discuss at length the application of each factor to the facts of this case. We limit our discussion to those considerations of particular significance in reaching our decision. Respondent determined $35,600 to be reasonable compensation for Castle because that was the aggregate of the weekly payments comparable to those paid in 1970 (when no additional *367 amount was paid) and Castle's duties did not change during the following years. An increase in salary without an increase in responsibilities can be indicative of unreasonableness (see, e.g., Pacific Grains, Inc. v. Commissioner,399 F. 2d 603, 607 (9th Cir. 1968); Huckins Tool and Die, Inc. v. Commissioner,289 F. 2d 549 (7th Cir. 1961); Perlmutter v. Commissioner,44 T.C. 382, 402 (1965), affd. 373 F. 2d 45, 49 (10th Cir. 1967)), but it is not determinative. Castle's salary was set at a relatively low level in 1970 because of his belief that the dealership was unable to pay him the salary he deserved at that stage. Petitioner's gross profit increased substantially in 1971 and 1972. In addition, during the taxable year ending August 31, 1964, petitioner paid greater compensation to Castle, who was also its president at that time, than respondent would allow herein. This fact lends support to our conclusion that Castle's 1970 salary should not establish the benchmark against which the reasonableness of subsequent compensation should necessarily be measured. Petitioner paid Barone compensation totaling $62,139 *368 in 1971 and $45,935 in 1972. Barone had no interest in petitioner as a stockholder, and there is no indication that his compensation was not determined at arm's length. Under such circumstances, the fact that a portion of his compensation was contingent on petitioner's net profits is not significant. Section 1.162-7(b)(2), Income Tax Regs. Castle had additional responsibilities beyond those of Barone, i.e., the purchase of used cars at auction and overall supervision of petitioner's business. On the other hand, petitioner declared only $5,000 in dividends during each of the taxable years involved, and these dividends were declared and the excess compensation was paid at the very end of each year after the level of petitioner's anticipated profits could be reasonably foreseen. Castle had other investments and endeavors to which he devoted some effort, although we have found that his involvement therein was limited. Additionally, petitioner has failed to introduce any evidence (other than unsupported assertions by Castle and Barone) as to compensation paid by comparable business to executives with responsibilities comparable to Castle's. [3] Nor are we impressed with petitioner's *369 attempt to buttress its position by aggregating the compensation it allegedly would have had to pay separately to each individual whose duties Castle assumed and performed. Where one person performs numerous tasks, reasonable compensation for that person is not necessarily the sum of amounts paid to numerous full-time employees who perform similar tasks. See Niagara Falls Coach Lines, Inc. v. Commissioner,T.C. Memo. 1977-269; C.A. White Trucking Co., Inc. v. Commissioner,T.C. Memo. 1977-6. Finally, we have not overlooked the fact that the agreement between petitioner and Castle contemplated *370 the possibility that a portion of the salary might be disallowed as unreasonable -- an element which is entitled to some consideration. See Charles Schneider & Co., Inc. v. Commissioner,500 F. 2d at 155. [4]
On the basis of the entire record herein, we hold that a reasonable compensation for Castle's services was $70,600 in 1971 and $65,600 in 1972, in addition to the health insurance benefits. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue.↩
2. Commissions actually due Barone were slightly different, to wit, $49, 468 for 1971 and $29,076 for 1972. The differences in amounts paid are accounted for by carryovers of unpaid commissions, including $2,388 from 1970.↩
1. First full year of operation by Thorman Ford without any assistance by Castle. ↩
2. Results for 10-month period.↩
3. First full year of operation by the petitioner.↩
3. Petitioner introduced into evidence a letter from another car dealer stating that, during 1976, it employed an individual to purchase used vehicles and it compensated this person $100 per car purchased. We found this letter deficient as probative evidence of comparability and we accorded it minimal weight. In the same vein, we gave little weight to respondent's evidence of average compensation of officers of car and truck dealers as reported in his Source Books of Statistics of Income for 1971 and 1972, because of the lack of evidence of comparability.↩
4. See also Saia Electric, Inc. v. Commissioner,T.C. Memo. 1974-290↩.