UNIVERSAL MANUFACTURING COMPANY, INC. AND SUBSIDIARIES (SUCCESSOR BY MERGER OF WNC CORPORATION), Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Universal Mfg. Co. v. Commissioner
Docket No. 22791-88
United States Tax Court
T.C. Memo 1994-367; 1994 Tax Ct. Memo LEXIS 376; 68 T.C.M. (CCH) 305; August 2, 1994, Filed *376 Decision will be entered under Rule 155. For petitioner: Steven S. Brown, Leigh D. Roadman, and Daniel T. Hartnett. For respondent: Judy Jacobs Miller. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined that petitioner is liable for deficiencies in its income tax and for accumulated earnings taxes as follows: Accumulated Year Ended
Income Tax Earnings Tax
September 30, 1984
$ 2,617,076
$ 2,113,056
September 30, 1985
269,775
--  September 30, 1986
4,670,398
3,526,247
After concessions by the parties, the only issue remaining for decision is whether petitioner's predecessor, WNC Corp. (WNC), is entitled to deduct $ 1,120,133, an amount which the parties have stipulated is to be treated as compensation accrued and paid by WNC to its principal stockholder and chief executive officer, Mr. Delbert W. Coleman, on December 31, 1985. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts, the Second Stipulation of Facts, and the exhibits attached thereto are incorporated herein by this reference. On March 13, 1987, after the taxable years in issue, WNC was merged into petitioner *377 in a statutory merger, and petitioner became WNC's successor. At the time it filed the instant petition in this Court, petitioner's principal place of business was Chicago, Illinois. WNC was an accrual basis taxpayer that reported income for Federal income tax purposes on the basis of a fiscal year ending September 30. During fiscal years 1984, 1985, and 1986, WNC was a holding company that engaged in the following lines of business through its subsidiaries: Printing and the manufacture of paper products; the import and export of hardwood lumber products, and the manufacture of furniture and cooperage components; and, the management of residential real estate. WNC's principal stockholder and chief executive officer, Mr. Coleman, incorporated WNC in 1979 and during the tax years in issue he owned 94 percent of WNC's outstanding stock. The remaining 6 percent of WNC's stock was owned by a trust established for the benefit of Mr. Coleman's children. Mr. Coleman was born in Cleveland, Ohio, on September 19, 1925. Following his honorable discharge from the Navy in 1945, Mr. Coleman attended Harvard College on the GI Bill. He graduated from Harvard in 1948. He then matriculated *378 to the University of Pennsylvania Law School and graduated from that school in 1952. He became a member of the Ohio bar. In 1953, Mr. Coleman learned that Westley Industries, a company in Ohio engaged in the automobile polish business, was for sale. Mr. Coleman investigated Westley Industries and concluded that the asking price was fair and that he could improve the company's operations and profitability. Mr. Coleman, a Harvard classmate, Mr. Herbert J. Siegal, and Mr. Siegal's father-in-law purchased Westley Industries. Mr. Coleman became its chief executive officer. Mr. Coleman and his investment partners later purchased a substantial interest in another company, Fort Pitt Brewery of Pittsburgh, Pennsylvania. At the time they purchased Fort Pitt Brewery, a labor strike had reduced the company's profitability and had damaged its customer relations. Mr. Coleman became chief executive officer and the company changed its name to Fort Pitt Industries, Inc. (Fort Pitt). Shortly thereafter, Mr. Coleman caused Westley Industries to be merged into Fort Pitt. Under Mr. Coleman's direction, Fort Pitt expanded its operations and returned to profitability. In 1958, Mr. Coleman oversaw *379 Fort Pitt's purchase of the stock of a family-owned business in Chicago, J.P. Seeburg Corp., which was in the business of manufacturing coin-operated vending machines and coin-operated phonographs, more commonly known as juke boxes. After the acquisition, Fort Pitt changed its name to Seeburg Corp. (Seeburg). At the time of its acquisition by Fort Pitt, Seeburg was on the verge of releasing an electronic cigarette vending machine. Under Mr. Coleman's direction as chairman of the board and chief executive officer, Seeburg expanded into the manufacture of hot drink vending machines that dispensed coffee, hot chocolate, tea, and soup, and vending machines that dispensed cold drinks with ice. Mr. Coleman also oversaw Seeburg's development of background music systems for business and industry, and the company's move in adopting the 33-1/3 RPM long-play record. During this period, Seeburg also expanded into the manufacture of hearing aids and electronic organs. Mr. Coleman and his fellow investors sold Seeburg in 1968 to Commonwealth United Corp. for $ 45 per share. Mr. Coleman realized a pretax profit of approximately $ 9.5 million from the transaction. During Mr. Coleman's 10-year *380 tenure as chairman of Seeburg's board of directors, annual revenues of the company had grown from $ 18 million to $ 100 million and the number of employees had increased from 400 to more than 6,000. In 1961, Mr. Coleman led an investment group to purchase another corporation, Weather-Tite Industries (Weather-Tite), a manufacturer of aluminum doors and windows. Mr. Coleman thought that Weather-Tite's system of distribution could be improved to increase sales volume and profitability. At approximately the same time, Mr. Coleman had purchased stock in Pacific Coast Co. (PCC), a company engaged in mining, lumber, and tankers. PCC had been losing money, but it had excess cash and operations that could be sold at a profit. Mr. Coleman led a proxy fight to take control of the company, and he was named chairman of PCC's board of directors in 1961. Following his appointment as chairman, Weather-Tite was merged into PCC, and PCC sold off several divisions. Weather-Tite, the successor corporation, then used its remaining cash to finance the expansion of its aluminum business. Over the next 7 years, Mr. Coleman's business plan was successful, and the number of Weather-Tite distributorships *381 increased from 13 to over 100. Despite PCC's success, its profitability was heavily influenced by fluctuations in the price of aluminum. Therefore, Mr. Coleman decided to sell the company. In 1968, the same year he sold Seeburg, Mr. Coleman arranged the sale of PCC to Noranda Mines, Ltd., a Canadian mining and industrial company. As a result of this transaction, Mr. Coleman made a pretax profit of approximately $ 12.8 million on his investment in PCC. In the years following the sales of PCC and Seeburg, Mr. Coleman continued to invest in other companies, such as Marine Capital Corp., a venture capital company; Zenith Life Insurance Co., a life insurance company based in Wisconsin; J.G. Turney & Sons and its parent company, William Whiteley & Co., a distillery in Scotland; Enness Realty Co., a real estate development company; Canton Wood Products, a company engaged in making cooperage and barrels; Universal Manufacturing Co., a manufacturer of paper products; PTL venture, the owner of a large Chicago apartment building; Terminal Data Corp., a real estate development in California; Kentucky Furniture, a maker of oak furniture; and Carolina Timber, a wood mill. At one point, Mr. *382 Coleman held an interest in the Milwaukee Braves baseball organization. Mr. Coleman and other investors purchased the team after the death of the Braves' former owner, Mr. Fred Miller of the Miller Brewing Co., who had moved the team from Boston to Milwaukee. After several years, it became apparent to Mr. Coleman that the Braves could not generate sufficient advertising revenues to achieve a satisfactory level of profitability because of the team's proximity to two other baseball teams in Chicago, the White Sox and the Cubs. Therefore, Mr. Coleman took the lead in moving the team to Atlanta, where it was eventually sold to Mr. Ted Turner. In 1979, Mr. Coleman incorporated WNC to act as a holding company for his business interests. In the years after it was incorporated, WNC acquired ownership of several other corporations. One of these corporations which WNC acquired in April 1981, was Media Corp. of America (MCA), a manufacturer of paperboard novelties. At the time of its acquisition, MCA had significant net operating losses (NOLs). In the years following its acquisition, MCA's NOLs offset much of petitioner's taxable income. Mr. Coleman was the sole member of WNC's board *383 of directors from the time of WNC's incorporation until his resignation from the board effective on November 10, 1985. Mr. Hugh Flynn became WNC's sole director on that date and occupied that position until September 29, 1986, when Mr. Coleman removed him from that position, and again elected himself sole director of the company. Mr. Coleman was WNC's chief executive officer from the date of its incorporation through the end of its fiscal year 1986. As such, he was responsible for all major decisions regarding the company and its subsidiaries. He selected the management personnel of the operating companies, evaluated potential acquisitions, and established and maintained relationships with accountants, lawyers, and banks. He was involved in all decisions regarding pricing, and he met regularly with management personnel of each of WNC's subsidiaries to discuss financial and business decisions. Mr. Coleman also guaranteed $ 2.8 million of petitioner's debt, which petitioner incurred when WNC, which was later merged with petitioner, acquired the stock of petitioner. In March of 1985, Mr. Coleman suffered a stroke and he spent approximately 10 days in the hospital. The stroke *384 did not affect Mr. Coleman's mental faculties, but it paralyzed the entire left side of his body and impaired his speech. Mr. Coleman began an intensive program of physical therapy immediately after his release from the hospital. After 2 days of physical therapy at a local hospital, Mr. Coleman hired a private therapist to work with him at home. Mr. Coleman's commitment to his recovery was total; he spent 6 or 7 hours a day in intensive therapy. As a result, Mr. Coleman realized an almost total physical recovery in a few months. During the time it took him to recover from the stroke, Mr. Coleman continued to manage WNC's affairs. By June of 1985, Mr. Coleman had recovered sufficiently to be able to travel to Europe on WNC's behalf. In January or February of 1986, he traveled on business to Tokyo and Thailand. During its fiscal years 1979 through 1986, WNC paid the following amounts as salary to Mr. Coleman: Fiscal Year
Compensation
1979
--  1980
$ 400,000
1981
--  1982
--  1983
--  1984
275,000
1985
300,000
1986
800,000
Total
1,775,000
WNC deducted each of the above amounts on its Federal tax return for the fiscal year shown. Mr. Coleman did not believe *385 in taking a salary until the company had achieved a certain level of profitability. WNC paid Mr. Coleman's salary for fiscal year 1986 on or about September 30, 1986. An accountant representing petitioner wrote a letter to petitioner's attorneys dated February 9, 1987, which states as follows: Prior to September 30, 1986 WNC Corporation agreed to pay Delbert Coleman a salary and bonus of $ 800,000 which was paid on September 30, 1986. * * * The fiscal 1986 compensation is considerably higher to take into account the three years where Coleman received no compensation. I would appreciate it if you would draft the appropriate resolution to document the payment of the $ 800,000 of compensation.
Beginning in 1983, WNC made advances to Mr. Coleman that were characterized on its books and records as loans. Mr. Coleman also borrowed sums from WNC and various subsidiaries and gave promissory notes in return. All of these advances and loans provided for interest at the applicable Federal rate. WNC's tax returns report loans to shareholders at the end of each taxable year in the following amounts: Fiscal Year
Loans 1979
--  1980
--  1981
--  1982
--  1983
$ 10,961,000
1984
23,424,033
1985
22,216,892
1986
22,863,740
1987
--  *386 On August 5, 1987, the principal balance of Mr. Coleman's loans from WNC and its subsidiaries was $ 20,708,939. Mr. Coleman borrowed that amount from Continental Illinois National Bank and Trust Co. of Chicago and paid the loans in full. Petitioner used the funds received from Mr. Coleman to purchase a certificate of deposit which it pledged as collateral on Mr. Coleman's loan from the bank. When the certificate of deposit matured 3 months later, Mr. Coleman again borrowed the money from petitioner to repay the bank. WNC's tax return for fiscal years 1979 to 1986 report that WNC paid the following salaries to executives other than Mr. Coleman: Year
O. Wilner
J. Wilner
H. Flynn
R. Hutson
W. Weil
1979
--
--
--
--
--
1980
--
--
--
--
--
1981
--
--
--
--
--
1982
--
--
--
--
--
1983
--
--
--
--
--
1984
$ 92,400
$ 136,000
$ 80,000
$ 73,500
--
1985
178,160
131,385
84,945
78,404
$ 125,000
1986
93,864
135,385
81,606
75,081
--
We note that during the years 1979 through 1983, several of the executives listed above may have been paid by the various operating subsidiaries with which they were associated. The record does not make *387 clear, however, whether they were also employed by petitioner. Like the other companies that Mr. Coleman had managed over the years, WNC showed a marked and steady increase in profitability under Mr. Coleman's direction. The following chart, containing information taken from WNC's tax returns, summarizes WNC's growth in sales, taxable income, gross profits, assets, and stockholders' equity for fiscal years 1979 through 1986: Taxable
Taxable
Income
Income
Stock
Before
After
Gross
Total
holders'
Year
Sales
NOLs
NOLs
Profits
Assets
Equity
1979
$ 4,278,340
$ 758,643
$ 752,586
$ 2,266,667
$ 14,334,710
$ 483,782
1980
10,639,695
129,440
129,440
5,450,246
16,414,317
267,393
1981
12,028,111
802,139
-- 2,912,380
18,097,165
1,572,869
1982
14,326,351
6,016,513
-- 9,480,540
13,893,935
10,193,042
1983
17,765,010
2,687,676
-- 7,315,952
69,234,650
26,720,724
1984
21,117,811
5,789,026
-- 7,442,503
62,438,645
34,839,805
1985
18,716,416
315,817
-- 8,022,850
73,511,363
37,459,816
1986
24,152,049
9,702,190
-- 12,809,252
71,515,878
47,045,859
Respondent audited WNC's Federal income tax returns for fiscal years ending September *388 30, 1984, 1985, and 1986. Based on that audit, respondent determined deficiencies in WNC's income tax for fiscal years 1984, 1985, and 1986, as mentioned above. Respondent also determined that petitioner is liable for accumulated earnings taxes for fiscal years 1984 and 1986. Contemporaneously with her audit of WNC's returns, respondent audited Mr. Coleman's individual income tax returns for calendar years 1983, 1984, and 1985. At the conclusion of that audit, respondent recharacterized as dividends some of the advances and loans that had been made by WNC to Mr. Coleman during those years. In the notice of deficiency issued to Mr. Coleman, respondent made the following determination: During 1983, 1984, and 1985 you received monies from WNC Corporation & subsidiaries it [sic] has been determined that these monies were dividends and not loans or shareholder advances. Since you did not include these dividends on your 1983, 1984, or 1985 returns your taxable income is increased as follows:
Year
Increased Income
1983
$ 8,261,528
1984
6,153,383
1985
4,277,335
In response, Mr. Coleman filed a petition with this Court seeking redetermination of the above adjustments *389 to his income. In March of 1990, a Decision and Stipulation were filed with the Tax Court resolving Mr. Coleman's case. The decision reflected the following deficiencies: Year
Deficiency
1983
-- 1984
-- 1985
$ 555,869
As part of the settlement of Mr. Coleman's tax case, his attorney, Mr. Stephen D. Gardner, and respondent's attorney, Mr. Lewis R. Mandel, executed the following stipulation (the Stipulation in Mr. Coleman's case): Respondent asserted, for the taxable years ended December 31, 1983, December 31, 1984 and December 31, 1985, that petitioner's [i.e., Mr. Coleman's] borrowings from WNC Corporation and its subsidiaries were, in fact, dividends. Respondent now agrees that such borrowings were not dividends. However, in order to dispose of the pending assertions by respondent and to reflect the hazards of litigation, petitioner [i.e., Mr. Coleman] agrees to include in income during the taxable year ended December 31, 1985, an amount of the total loan balance equalling $ 1,120,133, such amount to be treated as compensation accrued and paid by WNC Corporation on December 31, 1985, for all purposes of the Code.
Thus, in effect, Mr. Coleman agreed to *390 increase his taxable income for 1985 based on the theory that he had received additional compensation of $ 1,120,133 on December 31, 1985. As of the time of the settlement of Mr. Coleman's tax case, the compensation that WNC paid to Mr. Coleman during fiscal years 1987, 1988, and 1989 was $ 800,000, $ 1,625,000, and $ 1,507,500, respectively. During WNC's fiscal year 1990, the year in which the Stipulation in Mr. Coleman's case was entered into, WNC paid Mr. Coleman compensation of $ 2 million. Prior to the trial in this case, petitioner and respondent entered into a Second Stipulation of Facts (the Second Stipulation). As part of the Second Stipulation, respondent and petitioner agreed as follows: The parties agree that $ 1,120,133 characterized as a loan from WNC Corporation to Mr. Coleman shall be treated, for all purposes of the Code, as compensation accrued and paid by WNC Corporation to Del Coleman on December 31, 1985.
Thus, the parties have stipulated in this case that the amount in question formerly characterized as a loan from WNC to Mr. Coleman is recharacterized as compensation which was accrued and paid during WNC's fiscal year ending September 30, 1986. *391 OPINION Respondent agreed in the Stipulation filed in settlement of Mr. Coleman's tax case that the amount at issue, $ 1,120,133, would "be treated as compensation accrued and paid by WNC Corp. on December 31, 1985, for all purposes of the Code." Respondent also agreed in the Second Stipulation, filed in this case, that the amount at issue "shall be treated, for all purposes of the Code, as compensation accrued and paid by WNC Corp. to Del Coleman on December 31, 1985." The sole issue for decision is whether WNC is entitled to deduct the subject compensation, $ 1,120,133, in computing its taxable income for fiscal year ending September 30, 1986. Section 162(a)(1) provides that in computing taxable income a taxpayer is allowed to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered". Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. Treasury regulations promulgated under section 162(a)(1) provide that the test of deductibility of compensation *392 for personal services is whether the payments: (1) Are reasonable in amount and (2) are in fact payments purely for services. Sec. 1.162-7(a), Income Tax Regs. Petitioner bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. Notwithstanding the stipulations described above, respondent asserts that the subject amount is not deductible by petitioner. Respondent's position is that reasonable compensation to Mr. Coleman for fiscal year 1986 is limited to $ 800,000, the amount WNC actually paid to him as compensation and deducted on its return for that year. According to respondent, petitioner has failed to establish that any part of the additional compensation, $ 1,120,133, is reasonable in amount. Petitioner asserts that the additional compensation is fully deductible under section 162(a)(1). Petitioner argues that the full amount of Mr. Coleman's compensation for fiscal year 1986, $ 1,920,133, is reasonable and is, therefore, deductible. Petitioner also makes three alternative arguments. First, petitioner argues that, under contract principles, *393 respondent is required by the Stipulation in Mr. Coleman's case to allow petitioner a deduction for the additional compensation at issue in this case. Second, petitioner argues that the doctrine of equitable estoppel bars respondent from disallowing a deduction of that amount to petitioner. Third, petitioner argues that the doctrine of judicial estoppel, recently adopted by this Court in Huddleston v. Commissioner, 100 T.C. 17 (1993), likewise prohibits respondent from disallowing the deduction. We agree with petitioner's contention that the subject compensation is reasonable in amount and is deductible by petitioner. Accordingly, we do not reach any of petitioner's three alternative arguments. Whether compensation is reasonable in amount is a question of fact to be resolved by an examination of all of the facts and circumstances of the case. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992); *394 Perlmutter v. Commissioner, 44 T.C. 382, 401 (1965), affd. 373 F.2d 45 (10th Cir. 1967). It is well settled that the factors considered relevant in determining the reasonableness of compensation include the following: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * *
Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. and remanding a Memorandum Opinion of this Court. Other factors include the employee's eligibility for pension or profit sharing benefits provided by the taxpayer, Kennedy v. Commissioner, 671 F.2d 167, 175 (6th Cir. 1982), *395 revg. and remanding 72 T.C. 793 (1979); guarantees by the employee of the employer's debt, R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972); and any agreement by the employee to repay compensation determined to be excessive by the Commissioner or the courts, Saia Electric, Inc. v. Commissioner, T.C. Memo. 1974-290, affd. without published opinion 536 F.2d 388 (5th Cir. 1976). All of the facts and circumstances must be considered as a whole with no single factor decisive. Mayson Manufacturing Co. v. Commissioner, supra at 119. At the outset, we note that, as of fiscal year 1986, Mr. Coleman had received no compensation in 4 of the 8 years of WNC's existence. It is evident, therefore, that Mr. Coleman was underpaid in each of those 4 years. Based on that fact, petitioner argues that the aggregate compensation actually paid to Mr. Coleman during fiscal years 1979 through 1986, $ 1,775,000, plus the additional compensation at issue in this case, $ 1,120,133, a total of $ 2,895,133, should be averaged to arrive at Mr. Coleman's *396 annual compensation of $ 361,891 (i.e., $ 2,895,133/8). Petitioner asserts that it is readily apparent, that average compensation for Mr. Coleman's services of $ 361,891 per year is reasonable. In support of this approach, petitioner cites United Title Ins. Co. v. Commissioner, T.C. Memo. 1988-38. Respondent counters that in making this argument petitioner, in effect, is seeking to deduct in fiscal year 1986 compensation for services performed by Mr. Coleman in prior years. Respondent correctly notes that in order for a taxpayer to be eligible to deduct compensation for past services, the taxpayer must show two things: First, that he was not fully compensated for the prior services and the amount of the undercompensation; and, second, that the current year's compensation was intended as compensation for past services. Estate of Wallace v. Commissioner, supra at 554; Bickes-Wilbert Burial Vault Co., v. Commissioner, T.C. Memo. 1986-172. Respondent does not deny that Mr. Coleman was undercompensated in prior years, the first prong of the test. Respondent argues that, as a matter of *397 law, petitioner cannot make the showing required under the second prong, that the aggregate amount at issue was intended as compensation for past services, because "as of the actual date of payment" WNC had characterized each payment as a loan, not as compensation. Furthermore, respondent argues that, even if petitioner is not foreclosed from making that showing as a matter of law, "there is no evidence of record that any portion of the $ 1,120,133 was intended to pay [Mr.] Coleman for past services." We do not fully agree with the position of either party of this point. We disagree with respondent that petitioner must prove that WNC intended to compensate Coleman for prior services "as of the actual date of payment". At that time, both WNC and Mr. Coleman considered the payments to be loans, and they had taken steps to document that characterization of the payments through promissory notes and book entries. If we look to the date on which each of the payments was actually made, petitioner could not even prove that any of the payments was intended as compensation, let alone intended as compensation for prior services. The effect of respondent's position on this point is to disavow *398 the agreement reflected in the Second Stipulation that the loan payments are to be recharacterized as compensation. The amount to be treated, under the Second Stipulation, as compensation paid to Mr. Coleman on December 31, 1985, consisted of loan payments totaling $ 1,120,133, which had been advanced during calendar years 1983, 1984, and 1985. Respondent acknowledges this fact in her brief: While the precise dates of the advancements to Coleman are not clear from the record, it is evident that the payments to Coleman which formed the basis of the agreement to include the $ 1,120,133 in income were made in either 1983, 1984 or 1985.
WNC had reported loans to shareholders on its returns for fiscal years 1983, 1984, 1985, and 1986. As mentioned above, petitioner bears the burden of proving that all or a part of the amount required by the Second Stipulation to be treated as compensation paid on December 31, 1985, was intended to compensate Mr. Coleman for services performed prior to WNC's fiscal year 1986. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7. A fair reading *399 of the Second Stipulation suggests that the parties intended to recharacterize, as compensation, loans that WNC had made to Mr. Coleman during WNC's fiscal years 1983, 1984, 1985, and 1986. However, the record does not reveal what part, if any, of the $ 1,120,133 had been advanced in any of those fiscal years. Mr. Coleman testified that he believed that he had been underpaid during the years preceding 1986. However, he did not testify that, at the time he entered into the stipulated settlement of his Tax Court case, petitioner intended the additional $ 1,120,133 as compensation for services rendered prior to WNC's fiscal year 1986. In fact, Mr. Coleman's testimony suggests the opposite: Q And now, the base -- the case was based upon loans to you over a three-year period. And yet this agreement specifies that the compensation is in one year. Is that right? A That is correct. Q Why didn't you settle the case and spread the payments over three years? A I don't even know if I had that option. But if I did, the interest would have been adjusted differently; I would have had more interest to pay.
Thus, the record suggests that portions of the additional compensation *400 of $ 1,120,133 may have been advanced to Mr. Coleman during calendar years 1983, 1984, and 1985. However, there is no way to quantify those amounts, nor is there persuasive evidence that WNC intended the recharacterized amount to constitute compensation for services rendered during its fiscal years 1979 through 1986. Accordingly, we find that petitioner has failed to prove that any portion of the additional compensation of $ 1,120,133 was intended as compensation for Mr. Coleman's services rendered in fiscal years prior to 1986. We will treat the additional compensation as having been paid for Mr. Coleman's services during fiscal year 1986, and we will consider whether compensation of $ 1,920,133 paid to Mr. Coleman during fiscal year 1986 is reasonable. We must address another preliminary point. Generally, if the employee who receives the compensation in question is the controlling shareholder of the corporation, then courts give special scrutiny to the compensation to determine whether it is something other than the purchase price of the employee's services, such as a distribution of the earnings of the corporation. E.g., Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), *401 affg. T.C. Memo. 1985-267; Charles Schneider & Co. v. Commissioner, 500 F.2d at 152; see also Dielectric Materials Co. v. Commissioner, 57 T.C. 587, 591 (1972). For example, section 1.162-7(b)(1), Income Tax Regs., cautions that in the case of a corporation having few shareholders, "An ostensible salary paid by a corporation may be a distribution of a dividend on stock." See Estate of Wallace v. Commissioner, 95 T.C. at 555; Charles Schneider & Co. v. Commissioner, 500 F.2d at 152-153. This case is unusual because of the terms of the Second Stipulation under which the amount at issue is to be treated as "compensation". This stipulation precludes a finding that the amount at issue is, in whole, or in part, a distribution of the earnings of WNC or anything other than the purchase price of Mr. Coleman's services. Respondent does not suggest otherwise. Thus, the Second Stipulation resolves in petitioner's favor one of the factors mentioned by the court in Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 119, *402 "comparison of salaries with distributions to stockholders". We now proceed to consider the other factors. Mr. Coleman's Role in the Company
Many factors are relevant in assessing an employee's role in the company. Most important are the employee's irreplaceability and his responsibility for the company's success. American Foundry v. Commissioner, 536 F.2d 289 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972); see also Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1158 (1980); Hendricks Furniture, Inc. v. Commissioner, T.C. Memo. 1988-133. Mr. Coleman was a highly successful entrepreneur who had a history of purchasing ailing companies, and, through his business skill and foresight, turning them into successful ventures. His business successes throughout his career are testimony to this skill. He would be a highly valuable employee for any company. It is clear that Mr. Coleman asserted overall direction and control of WNC and each of its subsidiaries. Mr. Coleman made all decisions regarding WNC's acquisitions and investments. *403 Mr. Coleman made all managerial hiring decisions and met regularly with the managers of each of WNC's subsidiaries to discuss the company's operations, objectives, and important decisions regarding pricing. In order to ensure adequate capital for petitioner's operations, Mr. Coleman met with all of petitioner's bankers and accountants. Further, Mr. Coleman was involved in all discussions with petitioner's legal advisers. Given the role played by Mr. Coleman in petitioner's success, it would have been very difficult, if not impossible, for petitioner to replace Mr. Coleman. Respondent does not challenge petitioner's assertion that Mr. Coleman was responsible for WNC's success. In fact, one of the findings of fact requested by respondent is the following: Mr. Coleman has been the chairman of the board of WNC Corporation since its inception in 1979. He effectively runs the company and makes or approves all major decisions.
Respondent asserts that the substantial increase in Mr. Coleman's compensation for fiscal year 1986, an increase of 480 percent, is unsupported by any change in Mr. Coleman's credentials and responsibilities. Respondent points to the fact that "the *404 record indicates that in 1986 Coleman was still recovering from a stroke which admittedly impaired his abilities and caused a reduction of his duties." Respondent's argument on this point assumes that Mr. Coleman was fully compensated in each of the prior years so that an increase in compensation must be justified by a showing of additional duties and responsibilities. The premise of respondent's argument is belied by the fact that in 4 of the 7 fiscal years prior to the year at issue, Mr. Coleman had received no compensation at all. Thus, we do not believe that the compensation paid to Mr. Coleman in those prior years is a bench mark of the compensation to which he is entitled for fiscal year 1986. Furthermore, the record suggests that Mr. Coleman continued to manage the affairs of WNC and each of its subsidiaries during his rehabilitation from the stroke in March of 1985. We find that WNC's remarkable growth and profitability between 1979 and 1986 are directly related to Mr. Coleman's skills and to the services that he provided. We do not think that WNC would have been able to achieve the success that it did during that period were it not for Mr. Coleman's services and commitment *405 to WNC. The Character and Condition of the Company
The past and present financial condition of the company is important in determining the reasonableness of compensation. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1157-1158. The complexity of the business environment and the general condition of the economy are other important considerations. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974). The following schedule, composed of information taken from WNC's tax returns, summarizes WNC's sales, gross profits, taxable income before deducting NOLs, taxable income after deducting NOLs, total assets, and stockholders' equity for fiscal years 1979 through 1986: Taxable
Taxable
Total
Income
Income
Stock
Fiscal
Gross
Before
After
holders'
Year
Sales
Profits
NOLs
NOLS
Assets
Equity
1979
$ 4,278,340
$ 2,266,667
$ 758,643
$ 752,586
$ 14,334,710
$ 483,782
1980
10,639,695
5,450,246
129,440
129,440
16,414,317
267,393
1981
12,028,111
2,912,380
802,139
-- 18,097,165
1,572,869
1982
14,326,351
9,480,540
6,016,513
-- 13,893,935
10,193,042
1983
17,765,010
7,315,952
2,687,676
-- 69,234,650
26,720,724
1984
21,117,811
7,442,503
5,789,026
-- 62,438,645
34,839,805
1985
18,716,416
8,022,850
315,817
-- 73,511,363
37,459,816
1986
24,152,049
12,809,252
9,702,190
-- 71,515,878
47,045,859
*406 As can be seen from the above, WNC's financial performance under Mr. Coleman's direction was impressive. From fiscal year 1979 to 1986, WNC's gross sales increased over 460 percent, from $ 4 million to $ 24 million. During that period its gross profits increased more than 560 percent, from $ 2.3 million to $ 12.8 million. Its taxable income before deducting NOLs increased more than 1,100 percent, from $ 758,000 to $ 9.7 million. Its total assets increased nearly 400 percent, from $ 14.3 million to $ 71.5 million and its net assets increased over 9,700 percent, from $ 483,000 to $ 47 million. Thus, by any measure, WNC's growth during this period was significant. Mr. Coleman's Compensation and the Independent Investor Standard
The following schedule compares Mr. Coleman's compensation for fiscal years 1979 through 1986 to WNC's sales: Mr. Coleman's
Compensation
Fiscal
Mr. Coleman's
as a Percentage
Year
Compensation
Sales
of Sales
1979
-- $ 4,278,340
-- 1980
$ 400,000
10,639,695
3.75
1981
-- 12,028,111
-- 1982
-- 14,326,351
-- 1983
-- 17,765,010
-- 1984
275,000
21,117,811
1.3 1985
300,000
18,716,416
1.6 1986
1,920,133
24,152,049
7.95
2,895,133
123,023,783
2.35
*407 As shown above, Mr. Coleman's aggregate compensation for fiscal year 1986 is 7.95 percent of WNC's sales for the same year. The following schedule compares Mr. Coleman's compensation for fiscal years 1979 through 1986 to WNC's gross profits: Mr. Coleman's
Compensation as
a Percentage
Fiscal
Mr. Coleman's
Gross
of Petitioner's
Year
Compensation
Profits
Gross Profits
1979
-- $ 2,266,667
-- 1980
$ 400,000
5,450,246
7.33
1981
-- 2,912,380
-- 1982
-- 9,480,540
-- 1983
-- 7,315,952
-- 1984
275,000
7,442,503
3.69
1985
300,000
8,022,850
3.73
1986
1,920,133
12,809,252
14.99
2,895,133
55,700,390
5.20
As shown above, Mr. Coleman's compensation for fiscal year 1986 is 14.99 percent of WNC's gross profits for the same year. Finally, the following schedule compares Mr. Coleman's compensation for fiscal years 1979 through 1986 to WNC's taxable income, computed before deducting Mr. Coleman's compensation or NOLs: Taxable Income
Mr. Coleman's
Before Deducting
Compensation
Mr. Coleman's
as a Percentage
Fiscal
Mr. Coleman's
Compensation or
of Petitioner's
Year
Compensation
NOLs
Income
1979
-- $ 758,643
-- 1980
$ 400,000
529,440
75.55
1981
-- 802,140
-- 1982
-- 6,016,513
-- 1983
-- 2,687,676
-- 1984
275,000
6,064,026
4.53
1985
300,000
615,817
48.71
1986
1,920,133
10,502,190
18.28
2,895,133
27,976,445
10.35
*408 As shown above, Mr. Coleman's compensation as a percentage of WNC's taxable income ranged from a low of zero percent in fiscal years 1979, 1981, 1982, and 1983 to a high of 75.55 percent in fiscal year 1980. In fiscal year 1986, the year in question, Mr. Coleman's compensation of $ 1,920,133 represented 18.28 percent of WNC's income. An important factor in determining the reasonableness of compensation paid by a closely held corporation to its controlling shareholder is an evaluation of the amount of the compensation from the point of view of a hypothetical independent investor. E.g., Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326-1327; Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1245 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. The relevant inquiry is whether an independent investor would approve the subject compensation in view of the nature and quality of the services performed and the effect of those services on the investor's return on his or her investment. Elliotts, Inc. v. Commissioner, 716 F.2d at 1245. The prime indicator *409 of the return a corporation is earning for its investors is its return on equity. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1326-1327. Set out below is a schedule which shows WNC's taxable income before deducting NOLs, the shareholders' equity reported by WNC, and the return on investment for fiscal years 1979 through 1986: Fiscal
Taxable Income
Shareholders'
Return on
Year
Before NOLs
Equity
Investment
1979
$ 758,643
$ 483,782
156.82%
1980
129,440
267,393
48.41%
1981
82,139
1,572,869
51.00%
1982
6,016,513
10,193,042
59.03%
1983
2,687,676
26,720,724
10.06%
1984
5,789,026
34,839,805
16.62%
1985
315,817
37,459,816
.84%
1986
[1] 8,582,057
45,925,726
18.69%
The above schedule shows that after taking into account the additional compensation of $ 1,120,133, WNC earned an 18.69 percent return on equity for fiscal year 1986. Comparison With Similar Companies
Petitioner introduced expert testimony to evaluate the reasonableness of Mr. Coleman's salary. We weigh expert evidence in light of the demonstrated qualifications *410 of the expert and all other relevant evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not obligated to accept the opinion of an expert witness where the record before us does not support his conclusions or where an expert's opinion is contrary to our own judgment. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244; Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). Petitioner's expert, Mr. Theodore I. Pincus, was a C.P.A. and management consultant who specialized in executive compensation and had more than 15 years' experience in designing executive compensation plans. Mr. Pincus did not compare Mr. Coleman's salary to the salaries paid to CEOs of companies in the same lines of business as petitioner, i.e., printing, cooperage, and real estate. Rather, Mr. Pincus testified to the practice of compensating CEOs of what he termed "privately held investment companies" of a size similar to petitioner. Mr. Pincus defined "investment *411 company" as a holding company that owns operating subsidiaries, but which itself does not engage in direct business activities. Mr. Pincus' written report states as follows: WNC Corporation, the parent company, is an investment company formed in 1979. The majority of investment companies are privately held, accordingly the compensation of Mr. Coleman's counterparts is not readily available. However, the compensation of senior executives of such companies is typically directly related to the net worth of the portfolio companies managed, increased or decreased by their profitability. A portfolio of approximately $ 50 million in net worth, including five to ten companies, would be considered a medium-sized investment company. The annual compensation of the most senior management executive of successful medium-sized investment companies would be expected to range from 2% to 5% of asset value, or $ 1 to $ 2.5 million.
At trial, Mr. Pincus testified on cross-examination that the compensation packages of chief executive officers of the companies described above typically include several components, one based upon net assets and another based upon profitability. He testified *412 as follows: A. My experience has been that the packages of compensation tend to have components of a percentage of the assets under management -- Q. Okay. A. -- and a component which is compared to the profitability of the enterprise. For investment companies of this size, the net resulting package tends to fall in the 2 to 5 percent range of assets, but it is not computed that way.
As an example, he mentioned a company called Triumph Capital that, according to Mr. Pincus, was a medium-sized investment company (i.e., an investment company with subsidiaries whose assets total between $ 50 and $ 75 million) which paid its CEO on the basis of a formula, 2 percent of net assets, plus 20 percent of profits after allowing an 8-percent return on shareholder equity. Applying the same formula to the facts of this case produces the following compensation: (a) Taxable income
before deducting compensation and NOLs $ 10,502,190 (b) Less 2 percent of stock-
holders' equity, $ 47,045,859 (940,917)
$ 940,917
(c)
9,561,273 (d) Less 8 percent return
on stockholders' equity (3,763,668)
(e)
5,797,605 (f) 20% of line e
1,159,521
(g) Total compensation
2,100,438
*413 Respondent did not introduce expert testimony at trial. We draw no inference from this failure to introduce expert testimony. See LaMastro v. Commissioner, 72 T.C. 377, 385 (1979). Respondent introduced into evidence certain articles taken from Crain's Chicago Business Report. The articles summarize the salaries paid to CEOs of the 100 largest publicly held companies in the Chicago area. We find these articles of little probative value because, we are unable to determine how the compensation of the listed executives was determined. It appears that for some years the amount listed included only cash compensation and does not include stock options and other forms of compensation not available to Mr. Coleman in fiscal year 1986. Petitioner's Salary Policy Towards Other Employees
WNC's Federal income tax return for fiscal year 1986 lists four other executives besides Mr. Coleman who received a salary from petitioner. The salaries of these executives ranged from $ 75,081 to $ 135,385. On brief, petitioner claims that during fiscal years 1979 through 1986, one of these other executives, Mr. O. Wilner, received aggregate compensation of approximately *414 $ 2.6 million. Petitioner points to this fact as evidence of the reasonableness of Mr. Coleman's aggregate salary, during the same period, $ 2,895,133. We have reviewed petitioner's tax returns and note that the returns for the 1979-1983 period do not report that WNC paid Mr. Wilner any salary. It may be that, during those years, Mr. Wilner was paid directly by one of WNC's subsidiaries. In any event, during fiscal year 1986, WNC paid $ 92,000 to Mr. Wilner. Other Factors
There are other factors that favorably impact petitioner's case. Petitioner did not provide Mr. Coleman with any pension or profit-sharing benefits. Kennedy v. Commissioner, 671 F.2d 167, 175 (6th Cir. 1982), revg. and remanding 72 T.C. 793 (1979). Thus, Mr. Coleman's compensation is limited solely to his salary. Cf. Hendricks Furniture, Inc. v. Commissioner, T.C. Memo. 1988-133 (where compensation included salary, bonus, and profit-sharing contribution). Mr. Coleman also guaranteed approximately $ 2.8 million of WNC's debt that was incurred when it acquired petitioner's stock. See R.J. Nicoll Co. v. Commissioner, 59 T.C. 37, 51 (1972). *415 Finally, there is no evidence that petitioner and Mr. Coleman at any time entered into an agreement under which Mr. Coleman would repay to petitioner any amounts paid in compensation that were later determined to be unreasonable. Castle Ford, Inc. v. Commissioner, T.C. Memo. 1978-157. Conclusion
After examining all of the evidence in the record of this case, we believe that petitioner has carried its burden of proof regarding the reasonableness of the compensation paid to Mr. Coleman during fiscal year 1986. Mr. Coleman was WNC's key employee whose business skills and acumen were responsible for WNC's success. The growth of WNC's assets and income during fiscal years period 1979 to 1986, was impressive and was due to the services provided by Mr. Coleman. In reaching our finding that Mr. Coleman's compensation for fiscal year 1986 is reasonable, we note particularly that the parties agreed in the Second Stipulation that the entire additional amount, $ 1,120,133, is compensation, and we note that the corporation would have provided a hypothetical independent investor a return on stockholders' equity of more than 18 percent. Decision will *416 be entered under Rule 155. Footnotes
1. The amount reported reduced by $ 1,120,133, the additional compensation.↩